**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02493-RM-KMT

UMAR FAROUK ABDULMUTALLAB,

      Plaintiff,

v.

JEFFERSON SESSIONS, Attorney General of the United States, in his official capacity;
FEDERAL BUREAU OF PRISONS;
JOHN DOES 1 THROUGH 20, in their official capacities;

      Defendants.

---

**AMENDED COMPLAINT FOR INJUNCTIVE RELIEF,
DECLARATORY RELIEF, AND ATTORNEY'S FEES**

---

Plaintiff Umar Farouk Abdulmutallab, through his attorneys, Gail K. Johnson and

Aurora L. Randolph of Johnson & Klein, PLLC, hereby submits this Complaint alleging

violations of his rights under the First, Fifth, and Eighth Amendments to the United

States Constitution as well as under the Religious Freedom Restoration Act, 42 U.S.C.

§ 2000bb (RFRA).

## I.    INTRODUCTION

1.    Plaintiff Umar Farouk Abdulmutallab, a native of Nigeria, has been in

federal custody since December 25, 2009.  He is serving four terms of life imprisonment

plus 50 years for his convictions for the attempted use of a weapon of mass destruction

on a commercial airliner that landed in Detroit, Michigan, and the attempted murder of the 289 people on board.

2.      Mr. Abdulmutallab was indicted and prosecuted in the U.S. District Court for the Eastern District of Michigan for multiple federal criminal offenses.  He pleaded guilty without a plea bargain to all counts charged against him.  He received the maximum sentence possible on each count and cumulatively.

3.      Mr. Abdulmutallab was only 23 years old on February 16, 2012, when he was sentenced to serve multiple life sentences in the federal prison system.

4.      In March 2012, Mr. Abdulmutallab was transferred to the United States Penitentiary–Administrative Maximum in Florence, Colorado (ADX), to serve his life sentences there.  ADX is the highest security prison operated by the Federal Bureau of Prisons (BOP).

5.      The conditions of confinement at ADX are the most restrictive of any federal prison in the United States.  As a result of his transfer to ADX, Mr. Abdulmutallab was placed in indefinite, long-term solitary confinement—potentially for *decades*.

6.      The United States government believes that Mr. Abdulmutallab was recruited to commit his crimes of conviction by Anwar Al-Awlaki.  On September 30, 2011, more than six years ago, and several months before Mr. Abdulmutallab was

convicted and transferred to ADX, Mr. Al-Awlaki was killed by a United States drone strike in Yemen.

7.      Before transferring Mr. Abdulmutallab to long-term solitary confinement at ADX, the United States government (through its Attorney General) placed Mr. Abdulmutallab under Special Administrative Measures (SAMs).  The SAMs imposed on Mr. Abdulmutallab prohibit him from having any communication whatsoever with more than 7.5 billion people, the vast majority of people on the planet.

8.      The BOP is among those entities responsible for implementing SAMs. Because he is under SAMs, Mr. Abdulmutallab is incarcerated in the H-Unit of ADX. All of the inmates at ADX who are under SAMs are housed in H-Unit, and all of the inmates housed in the H-Unit of ADX are under SAMs.

9.      The social isolation inherent in Mr. Abdulmutallab's placement in long-term solitary confinement at ADX is greatly exacerbated by his SAMs, which further isolate him from other people to a remarkable degree.  There are currently more than 154,000 inmates in BOP custody.  Of those 154,000 inmates, fewer than 30 are under SAMs and incarcerated at H-Unit in ADX.

10.     The hundreds of inmates incarcerated at ADX who are not under SAMs are allowed to communicate with any persons they wish, with very few exceptions.  Apart from attorney-client communications, such communications to and from ADX inmates are subject to monitoring by the BOP and other federal law-enforcement officials.

11.　　Mr. Abdulmutallab's SAMs have been renewed annually each year since their imposition, sometimes with minor modifications.  For example, previous versions of Mr. Abdulmutallab's SAMs in effect from March 2012 until August 2016 prohibited him from communicating with one of his own sisters, Maryam Mutallab.  This is true even though the BOP had previously allowed Mr. Abdulmutallab to communicate with Maryam Mutallab while he was incarcerated during the pendency of his federal criminal case at the Federal Correctional Institution-Milan in Michigan (FCI Milan).

12.　　In response to his request for contact with his sister, the BOP told Mr. Abdulmutallab the FBI denied his request because of "security concerns."  Neither the BOP nor the FBI provided Mr. Abdulmutallab any specific information supporting these purported security concerns.

13.　　Mr. Abdulmutallab's current SAMs allow him to communicate with Maryam Mutallab.

14.　　Since their imposition in 2012 and continuing until the present time, the SAMs have prohibited and continue to prohibit Mr. Abdulmutallab from communicating in any manner whatsoever with his nieces and nephews.  Mr. Abdulmutallab currently has thirteen nieces and nephews.  Twelve of them are children.  Nine of them are age 14 or younger.  Six of them are age 11 or younger.  Three of them are age 7 or younger.

15.　　According to 28 C.F.R. § 501.3(a), SAMs must be reasonably necessary to protect persons against the risk of death or serious bodily injury.  Mr. Abdulmutallab's

SAMs are not reasonably necessary to protect persons against the risk of death or serious bodily injury.

16.     According to 28 C.F.R. § 501.3(a), SAMs may be imposed on a BOP inmate only when there is a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. Neither when the SAMs were first imposed on Mr. Abdulmutallab, nor at any time thereafter, has there been evidence that Mr. Abdulmutallab's communications pose such a substantial risk.

17.     Prison walls do not form a barrier separating prison inmates from the protections of the United States Constitution.

18.     The communication restrictions contained in Mr. Abdulmutallab's SAMs and implemented by the BOP are an unconstitutional deprivation of his First-Amendment rights to free speech and association.  This infringement of Mr. Abdulmutallab's First-Amendment rights is not reasonably related to any legitimate penological interest.

19.     Mr. Abdulmutallab is a Muslim.  His SAMs severely restrict his ability to practice his religion.  These restrictions also violate Mr. Abdulmutallab's rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb (RFRA).

20.     During the more than five years that Mr. Abdulmutallab has been incarcerated at ADX, he has not been able to participate in group prayer in accordance

with his sincerely held religious beliefs.  ADX categorically prohibits congregational prayer, and Defendant BOP has a policy prohibiting group prayer in any facility unless in a designated area (generally only in a chapel) and at a designated time (generally only once a week).  On information and belief, inmates cannot access prison chapels very often.

21.     ADX does not currently have an imam on staff.  Nor does ADX currently have an imam on contract.  Mr. Abdulmutallab has not had regular access to an imam in several years.

22.     During the more than five years that Mr. Abdulmutallab has been incarcerated at ADX, he has not been provided with a halal diet and instead has been forced—sometimes forcibly, sometimes as a result of having no other options—to consume foods that are considered haram or religiously forbidden, in violation of his sincerely held religious beliefs.

23.     During his incarceration at ADX, Mr. Abdulmutallab has behaved well and maintained respectful relationships with BOP officials.

24.     Like other Muslim inmates in ADX's H-Unit, Mr. Abdulmutallab has been subjected to frequent harassment regarding his religion.  During prayer times, white supremacist inmates in H-Unit often curse, yell, scream, and say things that are religiously insulting and offensive to Muslims, including to Mr. Abdulmutallab.

25.     ADX corrections officers have allowed this religious harassment by white supremacist inmates against Muslim inmates in H-Unit to take place.

26.     Some corrections officers have themselves harassed Mr. Abdulmutallab by displaying to him during prayer times magazines containing photographs of naked women, which is religiously offensive to him.  Corrections officers have also defiled religious items in Mr. Abdulmutallab's cell, such as his prayer rug and Qu'ran.

27.     This harassment has rendered it extremely difficult for Mr. Abdulmutallab to manage the difficulties of the harsh conditions of solitary confinement by taking solace in his religion and religious practices.

28.     In the face of this prolonged, systematic, mental, spiritual, and psychological cruelty, Mr. Abdulmutallab has tried to shed light on the illegal and unconstitutional conditions of his confinement at ADX and under SAMs by engaging in nonviolent and passive protest in the form of hunger striking.

29.     Mr. Abdulmutallab has gone on hunger strike to protest his SAMs and in particular the fact that for several years, he was being arbitrarily denied any communication whatsoever with his own sister, Maryam Mutallab.  Mr. Abdulmutallab has also gone on hunger strike at ADX to protest the fact that prison officials allow the white supremacist inmates in H-Unit to continually harass Muslim inmates in H-Unit during Islamic prayer times.

30.     Hunger striking is a well-established means of drawing attention to—and nonviolently protesting—extreme human rights abuses and inhumane and illegal government oppression.  Newly captured enslaved persons crossing the Atlantic Ocean on the brutal and dangerous journey from Africa to America would hunger strike, and were force fed.  So too would enslaved persons in the United States sometimes hunger strike, and be force fed at the direction of their "owners."  Suffragettes in both the United Kingdom and in the United States sometimes protested the fact that the law denied women the right to vote by hunger striking, and were force fed.  And from Pelican Bay, California, to Youngstown, Ohio, prisoners in the United States have engaged in hunger strikes in recent years in order to shine the light of public attention on the harshness of supermax prison conditions and encourage reform.

31.     Instead of attempting to address Mr. Abdulmutallab's legitimate concerns about the illegal and inhumane treatment he has received, Defendants have intentionally and repeatedly responded to and retaliated against Mr. Abdulmutallab for exercising his constitutional right to hunger strike by force-feeding him and by transferring him to Range 13 at ADX.

32.     At ADX, Mr. Abdulmutallab has been repeatedly force fed in a manner that is excessively and unnecessarily painful, abusive, dangerous, and degrading.  On one occasion, the force-feeding tube was placed down his windpipe instead of his esophagus, causing the nutritional supplement liquid to enter his lungs and resulting in Mr.

Abdulmutallab feeling like he was being drowned in a manner akin to waterboarding.  On

other occasions, even when the force-feeding tube was placed down Mr. Abdulmutallab's

esophagus, the high speed and high volume used for the feeding has caused pain and

discomfort and has been unnecessarily risky to Mr. Abdulmutallab's health.  The force-

feedings of Mr. Abdulmutallab at ADX have also violated his religion.  His hunger

striking is necessarily a religious practice given his sincerely held religious beliefs and

the religious harassment he has experienced at ADX and is protesting when he hunger

strikes.  Additionally the BOP has force-fed him with substances that are "haram," which

he is religiously forbidden to consume.

33.     Range 13 is the most isolated range in ADX.  The degree of isolation for

the few inmates who are ever incarcerated there is more extreme than in H-Unit.  There

are four cells on Range 13, two on one side and two on the other.  Range 13 was designed

to hold up to two inmates, with one inmate being rotated between two cells on one side of

the range while another inmate being rotated between the two cells on the other side.  A

wall was constructed between the two sides of the Range to prevent inmates from

communicating with each other.  Range 13 has no ranges of inmate cells above or below

it.  Inmates incarcerated on Range 13 are moved from their cells to a "recreation" facility

without any human contact; a BOP official remotely opens and closes sliding doors

electronically and then the inmate walks from his cell into the "recreation" facility.

There is no exercise equipment in the Range 13 recreation facility and no view of other ADX inmates.

34.     The BOP denies that it uses solitary confinement, instead preferring the euphemism "restrictive housing."

35.     The U.S. Department of Justice's Office of Inspector General recently conducted an audit of "restrictive housing" and mental illness in the BOP, which culminated in a written report issued July 2017.  According to that report, when asked whether placement on Range 13 could be considered a form of solitary confinement, an ADX psychologist responded by describing the inmate experience in Range 13 as a form of torture:

> [Y]ou have no contact, you don't speak to anybody, and *it's a form of torture on some level*.… [Inmates] still talk to officers and stuff like that, but they don't really get a chance to see anybody…. They rec[reate] alone; we don't even have to be back there to rec them.  So, yes, I would say that they are in fact in solitary confinement.[1]

36.     Based on his indefinite incarceration in H-Unit under SAMs and where his nonviolent protests of the inhumane conditions of his confinement are met with brutal force-feeding and incarceration in Range 13, Mr. Abdulmutallab is subject to conditions of confinement amounting to an atypical and significant hardship in relation to the ordinary incidents of prison life.  Mr. Abdulmutallab has been and continues to be deprived of his liberty interest in avoiding such conditions of confinement without being

---

[1] Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness (July 2017), at 16 (emphasis added).

provided adequate notice and a meaningful opportunity to be heard, in violation of due process of law as guaranteed by the Fifth Amendment to the United States Constitution.

37.    The extreme communication restrictions of the SAMs violate Mr. Abdulmutallab's rights to free speech and association, including his right to family relationships, under the First and Fifth Amendments to the United States Constitution.

38.    By incarcerating Mr. Abdulmutallab under SAMs in H-Unit, the BOP has also significantly curtailed his ability to practice his religion.

39.    Defendant BOP and its staff at ADX have substantially burdened Mr. Abdulmutallab's practice of Islam in accordance with his sincerely held religious beliefs by denying him the opportunity for congregational prayer, access to an imam, a halal diet, and the right to nonviolently protest the religious harassment that is an integral part of his harsh conditions of confinement without being brutally force fed and transferred to the extreme isolation of Range 13.

40.    Mr. Abdulmutallab's SAMs, his indefinite solitary confinement at ADX, the extreme conditions of confinement in H-Unit at ADX, and the use of force-feeding in response to nonviolent passive protest in the form of hunger striking inflict unnecessary psychological pain on Mr. Abdulmutallab and are contrary to the evolving standards of decency that are the hallmark of a maturing society.  These factors together violate the proscription against cruel and unusual punishments in the Eighth Amendment to the United States Constitution.

41.     Mr. Abdulmutallab seeks a judgment declaring that Defendants' actions, policies, and practices described herein violate his constitutional rights under the First, Fifth, and Eighth Amendments to the United States Constitution and his statutory rights under RFRA.

42.     Mr. Abdulmutallab seeks an injunction prohibiting Defendant BOP from force-feeding him as a response to his passive, nonviolent protest—in the form of hunger striking—of his conditions of confinement and the violations of his religious rights.

43.     Mr. Abdulmutallab also seeks an injunction compelling Defendant Sessions to remove Mr. Abdulmutallab's SAMs.

44.     Mr. Abdulmutallab also seeks an injunction compelling Defendants to remove him from solitary confinement (a/k/a/ "restrictive housing").

45.     Mr. Abdulmutallab also seeks injunctive relief requiring the BOP to allow him to engage in daily congregational prayers, provide him with regular access to an imam, and provide him with a halal diet in accordance with his sincerely held religious beliefs.

## II.     JURISDICTION AND VENUE

46.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343(a)(4) because Mr. Abdulmutallab seeks equitable relief for the deprivation of rights secured by the United States Constitution and 42 U.S.C. § 2000bb-1(c) (RFRA), an Act of Congress providing or the protection of civil rights.

47.     This Court further has jurisdiction to grant declaratory relief under 28

U.S.C. § 2201(a) because there is an actual controversy within this Court's jurisdiction

regarding whether Defendants violated Mr. Abdulmutallab's constitutional and statutory

rights.

48.     Venue is proper in the District of Colorado under 28 U.S.C § 1391(b)(2),

because a substantial part of the events or omissions giving rise to the claims occurred or

will occur in the District of Colorado.

### III.    PARTIES

49.     Plaintiff Umar Farouk Abdulmutallab is a federal prisoner in the custody of

the BOP who has been continuously confined at ADX since March 2012.  Mr.

Abdulmutallab is a devout Muslim who regularly practices the Islamic faith.

50.     Defendant Jefferson Sessions is the Attorney General of the United States.

Attorney General Sessions has decision-making authority regarding the placement,

transfer, and treatment of prisoners within the BOP, as well as the power to direct the

imposition, renewal, and cessation of SAMs affecting prisoners within the custody of the

BOP pursuant to 28 C.F.R. § 501.3.  He is sued in his official capacity.

51.     Defendant BOP is an agency of the United States that is responsible for the

administration of federal prisons, including ADX.  The BOP maintains physical custody

of Mr. Abdulmutallab.

52.     Defendants John Does 1 through 20 ("John Does") are one or more

individuals, agencies, offices, or task forces that, upon information and belief, are

associated with the United States Department of Justice, federal law-enforcement

agencies, or agencies of the United States intelligence community and that have authority

and influence over the renewal and implementation of SAMs pursuant to 28 C.F.R.

§ 501.3.  They are sued in their official capacities.

## IV.    FACTUAL BACKGROUND

### A.    Mr. Abdulmutallab's Arrest, Guilty Pleas, and Sentence

53.    Mr. Abdulmutallab was arrested at Detroit Metropolitan Airport by U.S.

Customs and Border Protection Officers on December 25, 2009.

54.    The United States prosecuted Mr. Abdulmutallab for multiple federal

crimes.

55.    Mr. Abdulmutallab pleaded guilty to all counts charged against him in the

Indictment.

56.    He was sentenced to the maximum sentence on each count, resulting in a

cumulative sentence of more than four consecutive terms of life imprisonment.

57.    Mr. Abdulmutallab has been imprisoned at ADX for more than five years,

where he is locked down alone in his cell for 22-23 hours a day.

### B.    Mr. Abdulmutallab's Initial Confinement

58.    In early 2012, Mr. Abdulmutallab was initially confined to the special

housing unit of FCI Milan, where he was incarcerated in solitary confinement for

approximately 23 hours per day under highly restrictive conditions characterized by

social isolation and sensory deprivation.

59.     While in pretrial detention, Mr. Abdulmutallab was surveilled by correctional officers 24 hours a day.

60.     As a Muslim, Mr. Abdulmutallab sincerely believes that his religion requires him to consume only food items that are "halal," meaning lawful, as opposed to foods that are "haram," or forbidden.  Haram foods include, but are not limited to, pork and pork byproducts; meat from animals not slaughtered according to prescribed methods; and additives containing alcohol, including sugar alcohols, gelatin, animal shortening, and certain emulsifiers or enzymes.

61.     Islamic doctrine dictates, and Mr. Abdulmutallab sincerely believes, that non-halal ("haram" or forbidden) food destroys the spirituality and morality of the consumer.  Mr. Abdulmutallab further sincerely believes, as part of his religion, that a Muslim who consumes non-halal food is "faasiq" (dissolute) and considered a flagrant sinner, and that the prayers of a person eating haram food are considered ineffective.

62.     The Qu'ran states "Allah knows best who strayed from His path: and He knows best who receives His guidance.  So eat meat on which Allah's name has been pronounced, if you have faith in His signs."  Mr. Abdulmutallab believes that to fully observe this mandate of Islam, he must eat a completely halal diet with halal meats and that he is religiously forbidden from being vegetarian.

63.     During his incarceration at FCI Milan, Mr. Abdulmutallab had no access to a halal diet.

64.     At FCI Milan, Officer Polkinghorn and Officer Rutter would intentionally flip through sexually explicit magazines in Mr. Abdulmutallab's line of sight while he was praying.  This essentially forced Mr. Abdulmutallab to view naked images while praying in direct violation of his religion.

65.     Officer Polkinghorn and Officer Rutter also harassed Mr. Abdulmutallab by defiling his religious items during a shakedown of his cell.  When Mr. Abdulmutallab returned to his cell following the shakedown by these officers, he saw that the condition of his Qur'an had changed; some pages of the Qur'an had been partially ripped, and a sticky liquid had been put on the Qur'an.  Additionally, upon returning to his cell following this shakedown by these officers, Mr. Abdulmutallab saw that his prayer rug, which he had left neatly folded, was crumpled and lying in a different location, as if it had been kicked around.

66.     In addition to the persistent religious harassment, FCI Milan correctional officers including Officer Marvin deliberately made noises to continually deprive Mr. Abdulmutallab of sleep.

67.     The degrading and inhumane behavior of FCI Milan correctional officers toward Mr. Abdulmutallab foreshadowed the harsh and tormenting conditions of confinement he continues to face at ADX.

**C.     Transfer to ADX**

68.     In the beginning of March 2012, Mr. Abdulmutallab was notified that he was being transferred to ADX.

69.    Mr. Abdulmutallab's family had already come all the way from Nigeria to visit him on a planned and authorized family visit.

70.    Even though Mr. Abdulmutallab would not begin the transfer process until later that day, the BOP refused to allow Mr. Abdulmutallab to visit with his family.

71.    Mr. Abdulmutallab was temporarily housed at United States Penitentiary Florence pending his placement at ADX.

72.    His family again attempted to visit him at USP Florence.

73.    Despite that the family had already been approved for a visit, the BOP arbitrarily refused to allow the visit.  It would be over a year before Mr. Abdulmutallab would be able to see his family again in person.

74.    Mr. Abdulmutallab was placed in the special housing unit at USP Florence, where he had no access to a halal diet in violation of his sincerely held religious beliefs.

75.    Mr. Abdulmutallab was placed in a cell full of vulgar writing and sexually explicit pictures.  He was arbitrarily stripped searched in front of other inmates and female officers, in violation of his religion.

76.    On March 30, 2012, Mr. Abdulmutallab was told he would be have his ADX placement hearing the next day.

77.    Mr. Abdulmutallab immediately asked to speak to his attorneys in order to prepare for the hearing, but his request was ignored.

78.     A few days earlier, Mr. Abdulmutallab had been interviewed by a BOP psychologist who specifically encouraged him to attend ADX placement hearing. According to the psychologist, given Mr. Abdulmutallab's disposition, Mr. Abdulmutallab did not belong at ADX.

79.     The "hearing" was conducted in a prison counselor's office.  The hearing officer was on the telephone.

80.     At the beginning of the hearing, Mr. Abdulmutallab was told that the only purpose for his attendance at the hearing was to defend himself against any incident reports in his file.

81.     Mr. Abdulmutallab fruitlessly attempted to present evidence that many organizations including the United Nations and Human Rights Watch have shown that solitary confinement is counterproductive to the goal of rehabilitation.  He tried to explain to the hearing officer it was not necessary to designate him to ADX.  But he was immediately shut down and told that the BOP already monitors evidence related to solitary confinement.

82.     Mr. Abdulmutallab tried to recount to the hearing officer what the BOP psychologist had said, but the hearing officer told him that it was not relevant.

83.     In less than fifteen minutes, the hearing was over.

84.     A day later, Mr. Abdulmutallab received a report stating that he was designated to ADX.

85.     Mr. Abdulmutallab has received no prison disciplinary charges for violence while he has been incarcerated at ADX.  Mr. Abdulmutallab has not attempted to incite violence via communications with individuals outside of prison, and he does not intend to do so.

86.     Mr. Abdulmutallab does not have an ongoing desire to commit violent jihad.  Destined to serve his life in prison, Mr. Abdulmutallab wishes to serve out his sentence in peace and calm without causing trouble, as evidenced by his nonviolent record.

**D.     Background and Operation of ADX**

87.     At any given time, between 400 and 500 prisoners are housed at ADX. There are nine different maximum-security housing units, which are divided into six security levels:  the Control Unit (or "Bravo" Unit); the disciplinary Special Housing Unit (also called "Charlie" Unit, "Zulu" Unit, the "SHU," or the "Hole"); "Range 13," an ultra-secure and isolated four-cell wing of Charlie Unit in which the BOP houses prisoners it believes require confinement with virtually no human contact; four "General Population" Units ("Delta," "Echo," "Fox," and "Golf" Units); the Special Security Unit (also called the "SAMs" Unit or "H" Unit); and two units ("Joker" Unit and "Kilo" Unit) that in recent years have been used as transitional housing units for prisoners who have entered the ADX "Step-Down Program" can earn their way out of ADX and into a lower security classification.  Half of "Kilo" Unit – the K/B Unit – is used for the High Security

Adult Alternative Housing Program, a program designed for prisoners who have been confined in ADX for an extended period of time but who cannot move through the ADX Step-Down Program for transfer to an open population institution. Under BOP policy, this program is " . . . designed for inmates who have generally demonstrated that they can function in a less-secure environment within the ADX without posing a risk to institutional security." The K/B Unit is separate and distinct from the ADX Step-Down Program, and prisoners in the K/B Unit are able to freely move within the unit for up to four hours per day. Prisoners must be over fifty years of age to live in the K/B Unit.

88.     ADX prisoners who are not in the ADX Step-Down Program spend from 23-24 hours per day locked alone in their cells. The cells measure approximately 12 feet by 7 feet and have solid walls that prevent prisoners from viewing the interiors of other cells or having direct contact with other prisoners. All ADX cells have a solid door with a small closable slot.

89.     Each cell is furnished with a concrete bed, desk, and stool and a stainless-steel combination sink and toilet. The beds are usually dressed with a thin mattress and blankets over concrete.

90.     Each cell contains a single window, approximately 42 inches tall and 4 inches wide, which allows entry of some natural light but is designed to ensure that prisoners cannot see anything outside of their cells other than the building and sky.

91.     Meals are delivered three times a day, to be consumed alone inside the cell. With few exceptions, prisoners in most ADX units are allowed out of their cells only for limited social or legal visits, some forms of medical treatment, visits to the "law library" (a cell with a specialized computer terminal that provides access to a limited range of federal legal materials), and a few hours per week of indoor or outdoor recreation. Otherwise, prisoners remain locked in their cells.

92.     ADX offers four meal options to prisoners: a regular diet, no-pork diet, no-meat diet, and the Common Fare diet (a Kosher diet).

93.     Jewish prisoners are able to obtain their religiously-mandated kosher diet through the Common Fare diet.

94.     Food that is kosher is not necessarily halal.

95.     The prison commissary does not regularly sell meals that meet Mr. Abdulmutallab's religious needs, i.e., halal-certified meals that include halal meats.

96.     Kosher-certified meals with meat are regularly sold in the prison commissary.

97.     The refusal to provide a halal diet means Mr. Abdulmutallab is faced with a Hobson's choice at every meal—he must choose whether to eat or observe his religion.

**E.     The ADX Step-Down Program**

98.     The ADX Step-Down Program involves prisoners being progressively transferred through a series of three transitional housing units in which they are afforded direct, although still extremely limited, contact with other prisoners.

99.     Successful completion of the ADX Step-Down Program is necessary for a prisoner to be allowed to transfer out of ADX.  Still, prisoners who reside in the step-down units are confined to their cells for all but a few hours a day.

100.    Every prisoner intent on earning his way out of ADX is required to pass through Joker Unit.  One side of Joker Unit, comprising 32 cells, houses the first stage in the Step-Down Program.  Prisoners are eligible for transfer to Joker Unit only after completing an extended period of good conduct.

101.    Prisoners who avoid trouble in Joker Unit are eligible to move, after a time, to the second phase of Step-Down, where they have more privileges.

102.    The second phase of the ADX Step-Down Program is housed at USP Florence, which is directly across the street from ADX.  Prisoners who successfully complete the second Step-Down phase are eligible to move to the final Step-Down phase (also housed at USP Florence), which provides even more privileges and a pathway to transfer to a regular, high-security federal penitentiary.

103.    Unlike other ADX cells, the individual cells in the Step-Down units at ADX have no interior bars.  Accordingly, only one sliding solid steel door separates prisoners from the open day room at the center of the unit.  Joker-Unit prisoners are part of a "Recreation Group" of up to seven other prisoners housed on the same tier.  Each Recreation Group is released at once into the day room or outside recreation yard, where they have unrestricted access to one another.

104.    Mr. Abdulmutallab has never been housed in Joker-Unit in the more than five years he has been incarcerated at ADX.

105.    Successful completion of the Step-Down Program can take years, even if a prisoner behaves perfectly.  But any transgression, however minor, can and often does result in the prisoner's removal from the program, placement back in ADX's Special Housing Unit, and a restarting of the good-conduct clock.

106.    Many ADX prisoners have made it part way through the Step-Down Program several times, only to be returned to the SHU or general population based on a small transgression.

**F.    H-Unit**

107.    On Wednesday April 11, 2012, Mr. Abdulmutallab was transferred to H-Unit.

108.    H-Unit is one of the most restrictive units at ADX.  With the exception of a period of approximately three weeks when he was sent to Range 13, Mr. Abdulmutallab has been and continues to be confined in H-Unit since he was transferred to ADX in April 2012.  H-Unit contains only male inmates who are subject to SAMs.

109.    Mr. Abdulmutallab's H-Unit cell measures 75.5 square feet and contains a bed, table, cement slab, toilet, and television.

110.    Mr. Abdulmutallab's cell contains no shower.  He must use the communal shower located within his particular range.

111.    The communal shower area is frequently used as a toilet by many inmates and therefore unsanitary.

112.    Mr. Abdulmutallab's cell has a narrow window through which he can see the wall of the outside hallway, but no other cells or people other than those who pass by the window.  The cell has a smaller window to the outside that faces the recreation yard.

113.    Mr. Abdulmutallab is locked down alone in his cell for 22-23 hours a day.

114.    He is fed his meals in his cell and must eat every meal alone.

115.    Access to books from ADX education department, library access, commissary access, television and radio access, and family and legal visitation are subject to significantly greater restrictions in H-Unit than in other ADX units.

116.    Whenever Mr. Abdulmutallab leaves his unit, such as to attend a legal visit, he is placed in hand and leg shackles that are connected to chains circling his waist, and he is accompanied by multiple corrections officers.

117.    Mr. Abdulmutallab is placed in leg shackles and belly chains during legal visits and when being escorted within H-Unit.

118.    Mr. Abdulmutallab's recreation schedule is as follows:  two hours per day, either outside (six days a week) or inside (one day a week).  The outside recreation facilities consist of a yard with six individual cages.  The indoor recreation facilities consist of a large cell in which Mr. Abdulmutallab does not see any other inmates.

**G.      Imposition of Special Administrative Measures (SAMs)**

119.    In April 2012, Mr. Abdulmutallab was placed under SAMs based on "his proclivity for violence."

120.    Pursuant to 28 C.F.R. § 501.3, SAMs may be imposed only at the direction of the Attorney General and, upon that direction, authorization to the Warden by the Director of the BOP, upon written notification "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."

121.    Pursuant to 28 C.F.R. § 501.3, SAMs "may include housing the inmate in administrative detention and/or limiting certain privileges including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism."

122.    Pursuant to 28 C.F.R. § 501.3, SAMs may not be imposed for a period of longer than one year, though they may be extended in one-year increments thereafter by the Director of the BOP upon receipt of written notification from the Attorney General or, at the Attorney General's direction, from the head of a federal law-enforcement agency or the head of a member agency of the U.S. intelligence community, "that there continues to be a substantial risk that the inmate's communications or contacts with other

persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons."

123.   The SAMs imposed upon Mr. Abdulmutallab have been continually renewed on an annual basis since their imposition in April 2012.

124.   Mr. Abdulmutallab has never been apprised of or provided meaningful notice of the reasons for his initial placement under SAMs nor of the reasons for their annual renewals.

125.   Mr. Abdulmutallab was not provided a hearing or other opportunity to address the imposition of SAMs prior to their imposition.

126.   While Mr. Abdulmutallab has availed himself of the opportunity to provide comments about at least some of the annual renewals of the SAMs, his requests for modification or removal of the SAMs have uniformly been rejected and denied without meaningful explanation.

127.   Defendant Sessions continues to impose SAMs on Mr. Abdulmutallab without adequate justification or procedural protections for Mr. Abdulmutallab's liberty interests.

128.   On information and belief, Mr. Abdulmutallab's SAMs are imposed on him based on assumptions about his beliefs.  During his SAMs renewal process, Mr. Abdulmutallab has not even been asked if he has an ongoing commitment to violence or violent jihad.

129.    There is no reasonable connection between the proffered justifications for

Mr. Abdulmutallab's SAMs and those restrictions.  This is illustrated by Defendants non-

imposition of SAMs on inmates whose criminal records (and institutional conduct) raise

similar or more grave concerns than those Defendants proffer to justify the imposition of

Mr. Abdulmutallab's SAMs.

130.    For example, another inmate imprisoned at ADX, Theodore ("Ted")

Kaczynski, was convicted of terrorism-related charges based on actions that resulted in

the deaths of three individuals and the injuries of twenty-eight others.[2]  During the trial,

the prosecution presented diary entries in which Mr. Kaczynski said he had found it

"'frustrating, but I can't seem to make a lethal bomb."[3]  During his criminal trial, Mr.

Kaczynski responded "Yes, Your Honor" in "what sounded like cheerful tones as Judge

Burrell asked him repeatedly if he acknowledged committing the acts" described by

prosecutors, and "he seemed self-confident to the point of defiance…seem[ing] to see the

situation as comic or absurd."[4]  Mr. Kaczynski is well known for his persistent media

messaging to spread the political messages behind his crimes of conviction.  In 1995,

during his 17-year spree of bombings, Mr. Kaczynski coerced The Washington Post and

The New York Times to publish a 35,000-word essay explaining his motives and views

---

[2] See Unabomber, Federal Bureau of Investigation – Famous Cases & Criminals,
https://www.fbi.gov/history/famous-cases/unabomber (last accessed on Apr. 8, 2018).
[3] William Glaberson, The Unabomber Case: The Overview; Kaczynski Avoids a Death Sentence
With Guilty Plea, The New York Times (Jan. 23, 1998),
https://www.nytimes.com/1998/01/23/us/unabomber-case-overview-kaczynski-avoids-death-
sentence-with-guilty-plea.html (last accessed on Apr. 8, 2018).
[4] Id.

of the ills of modern society under the threat of more bombings if they refused.[5]  Since

his imprisonment, Mr. Kaczynski has continued to spread his messages through prolific

correspondence and regular interviews with the media.[6]  Despite these factual

circumstances, Mr. Kaczynski is not under SAMs.  And, on information and belief, Mr.

Kaczynski is housed in the K/B Unit at ADX.

131.    Similarly, for example, despite Defendant BOP's explicit recognition that

"[Matthew Hale] has used his subtle and sophisticated communications skills to solicit

the murder of a federal judge," Mr. Hale is not under SAMs or, according to Defendant

BOP, any correspondence restrictions whatsoever.[7]  Before his incarceration, Mr. Hale

was the worldwide leader of Creativity (also referred to as "Church of the Creator"), a

BOP-designated Security Threat Group (STG) because of its long history of racially

motivated violence, on the streets and in prison.  The BOP defines an STG as "an inmate

group, gang, or organization acting in concert to promote violence, escape, drug,

disruptive, and/or terrorist activity."[8]  Mr. Hale was convicted by a federal jury in 2004 of

plotting the death of U.S. District Court Judge Joan Lefkow after she ruled against him

and ordered his supremacist group to change its name in a trademark-infringement case.

---

[5] *Id.*

[6] Holly Bailey, *The Unabomber's Media Strategy*, Yahoo! News (Jan. 29, 2016)
https://www.yahoo.com/news/the-unabomber-s-media-strategy-204008303.html (last accessed
on Apr. 8, 2018).

[7] 14-cv-00245-MSK-MJW, Doc. 186, "Defendant[ BOP's] Motion for Summary Judgment on
All Remaining Claims," at 2 (D. Colo. August 1, 2017) ("Mr. Hale does not have standing to
pursue these claims. The last set of correspondence restrictions was removed in July 2013.")

[8] *Id.* at 51.

132.   Mr. Hale was incarcerated at ADX after his sentencing.  In 2010, Defendant BOP imposed a temporary mail restriction on Mr. Hale because he had designated himself as "Pontifex Maximus Pro Tempore" in correspondence to other Creativity affiliates, appearing to again assume a leadership role.  Defendant BOP went to great lengths to ensure Mr. Hale could communicate before they imposed this restriction.  For example, between August 2009 and June 2010, the BOP managed Mr. Hale's communications on a letter-by-letter basis.  In January 2011, the restriction on Mr. Hale was lifted.  Then in December 2012, Mr. Hale wrote to the leader of the National Socialist Movement, a Neo-Nazi organization, encouraging it to pursue "mass activism tactics"—specifically, "street demonstrations, rallies in parks, and meetings in public libraries"—to "reach people who don't necessarily wish to be reached" with "the Holy Swastika."  In response, in 2013 Defendant BOP again imposed a temporary mail restriction on Mr. Hale while he was imprisoned at ADX, putting him on Restricted General Correspondence Status.[9]

133.   This restriction was lifted in July 2013.  In May 2016, Mr. Hale was transferred to the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute"), "where he had broad communications privileges, including access to email."[10] While at FCI Terre Haute, "Mr. Hale reestablished contact with his associates and followers in the Creativity Movement.  He learned through communications with his

---

[9] *See* 28 C.F.R. § 540.15 (authorizing Warden to place individualized restrictions on inmate correspondence after receiving process).
[10] 14-cv-00245-MSK-MJW, Doc. 186, at 2.

followers that one of them was willing to 'take out' a federal judge or prosecutor for Mr. Hale.  Within a few weeks, Mr. Hale wrote, and the BOP email system inadvertently released, a 'press release' about a federal judge.  BOP officials considered the 'press release' to constitute a credible threat against the judge, in light of its racially inflammatory language and its potential impact on Mr. Hale's like-minded and pliant followers outside the prison.  As a result of Mr. Hale's communications at FCI Terre Haute, he was returned to the ADX in April 2017."[11]  At ADX, "Mr. Hale is now subject to a different approach to mail monitoring by the BOP.  Under that approach, Mr. Hale is permitted to send and receive mail.  But his mail must comply with the rules the Bureau of Prisons imposes on Security Threat Groups or 'STGs.'  Mr. Hale cannot be allowed to hold a position of authority in his STG, to communicate about his STG, or to be involved in the business of running his STG."[12]

134.    Mr. Hale has made statements suggesting he has no remorse for his crimes or violent beliefs.[13]  "In 1999, apparently in response to the Illinois bar refusing to grant a law license to Mr. Hale, a Creativity adherent named Benjamin Smith when on a shooting rampage, targeting black, Asian, and Jewish victims, killing two and injuring nine before turning the gun on himself.  Mr. Hale eulogized Mr. Smith, praising his willingness to 'take action for his people . . . and spread our sacred message.'  Mr. Hale later gave an

---

[11] 14-cv-00245-MSK-MJW, Doc. 186, at 2-3.

[12] *Id*.

[13] 14-cv-00245-MSK-MJW, Doc. 212, "Opinion and Order on Motion for Summary Judgment," at 25 (D. Colo. March 28, 2018) (quoting *United States v. Hale*, 448 F.3d 971, 975-77 (7th Cir. 2006)).

ambiguous statement on behalf of Creativity, refusing to condemn Mr. Smith's actions. Mr. Hale stated that 'it's not he policy of the church to commit crimes, but [due to racial grievances] do not be surprised when a white man of the character and honor of Ben Smith stands up and fights back in the way that he did.' Suggesting that 'the future will see more, more Ben Smiths,' Mr. Hale announced that 'we cannot condemn a man for doing what he feels in his heart is right, whether it's outside the tactics of the church or not… In 2000, when the Supreme Court refused to hear Mr. Hale's challenge to Illinois' denial of his law license, Mr. Hale left a message to Creativity followers, stating that he 'can no longer in good faith and good conscience urge, recommend, or instruct my adherents and supporters in general to obey the laws of this land.' He encouraged his followers to 'take whatever actions we deem necessary to resist this tyranny' and stated that 'whatever blood is spilled will be on the hands of those who so severely wronged us today.'"[14]

135.   Mr. Hale's beliefs and actions serve as an inspiration for individuals seeking to commit crimes. "Between 2005 and 2008, at least two individuals, William White and Hal Turner, were convicted of soliciting the murder of jurors and others connected with Mr. Hale's criminal trial."[15] And Mr. Hale is still able to communicate

---

[14] *Id*.
[15] *Id*. at 26 (citing *United States v. White*, 698 F.3d 1005 (7th Cir. 2012); *United States v. Turner*, 720 F.3d 411 (2d Cir. 2013)).

messages to his followers.[16]  Despite his underlying conviction and his continued

behavior, Mr. Hale is not—and never was—under SAMs.  According to Defendant BOP,

as of August 1, 2017, "[n]o mail ban has been imposed on him since [2013]."[17]  There are

no restrictions on the persons outside the prison with whom Mr. Hale can correspond,

including his followers in the Creativity Movement (they just cannot talk about the

business of the Creativity Movement because it is a designated STG).  Indeed, from April

7, 2017, to July 26, 2017, Mr. Hale had sent 64 pieces of non-legal mail and received 109

pieces of non-legal mail.  Mr. Hale is allowed to possess—in his ADX cell—a copy of

Nature's Eternal Religion (Creativity's "Bible")—which the BOP has said contains

extensive racially-inflammatory language and ideas, the dissemination of which in a

multi-racial prison environment is highly likely to lead to violent conflict among inmates.

136.   As yet another example, Eric Robert Rudolph—who pled guilty to four

bombings: the Olympic attack in Atlanta in the summer of 1996, attacks on an Atlanta

abortion clinic and gay club in 1997, and an explosion at an all-woman clinic in

Birmingham in 1998—is not now and never has been on SAMs.  Collectively, the

bombings perpetrated by Mr. Rudolph killed two people and injured 150.  At one of his

hearings, Mr. Rudolph "nodded vigorously as a narrative account of the bombings was

---

[16] *See* Mohammed Kloub, *From prison, white supremacist Matthew Hale endorses Roy Moore*, Chicago Tribune (November 27, 2017), http://www.chicagotribune.com/news/ct-met-matthew-hale-roy-moore-chicago-inc-20171127-story.html (last accessed on Apr. 10, 2018) (noting Mr. Hale's press release from prison).

[17] 14-cv-00245-MSK-MJW, Doc. 186, at 2.

read aloud, and at one point he appeared to wink in the direction of the prosecutors."[18]

When the judge asked if Mr. Rudolph had detonated the clinic bomb, which killed an off-

duty police officer and maimed a nurse, Mr. Rudolph said "I certainly did, Your

Honor."[19]   In a statement issued after he made his plea deal, Mr. Rudolph said "after the

agreement has been signed the talking heads on the news opine that I am 'finished,' that I

will 'languish broken and unloved in the bowels of some supermax,' but I say to you

people that by the grace of God I am still here-a little bloodied, but emphatically

unbowed."[20]   Mr. Rudolph has had essays he has written from prison posted on the

internet.[21]   In one essay, Mr. Rudolph justified violence against abortion clinics by saying

Jesus would condone "militant action in defense of the innocent."[22]   In 2013, Mr.

Rudolph published his autobiography from prison with help from his brother.[23]

137.    On March 16, 2018, Mr. Abdulmutallab's SAMs were renewed.  The 2018

SAMs are virtually identical to his previous SAMs, with a few non-substantive word

changes.

---

[18] Shaila Dewan, *Bomber Offers Guilty Pleas, and Defiance*, The New York Times (April 14, 2005), https://www.nytimes.com/2005/04/14/us/bomber-offers-guilty-pleas-and-defiance.html (last accessed Apr. 10, 2018).

[19] *Id*.

[20] *Id*.

[21] Jay Reeves, *Extremist Taunts His Victims From Prison*, Fox News (May 14, 2007), https://web.archive.org/web/20070516044017/http://www.foxnews.com/wires/2007May14/0,4670,EricRudolph,00.html (last accessed Apr. 10, 2018).

[22] *Id*.

[23] *See Bomber Eric Rudolph self-published autobiography from prison*, The Denver Post, https://www.denverpost.com/2013/02/23/bomber-eric-rudolph-self-publishes-autobiography-from-prison/ (last accessed Apr. 10, 2018).

138.    The only process Mr. Abdulmutallab received as to his 2018 SAMs renewal was the opportunity to fill out a standardized form regarding his SAMs.  On this form, Mr. Abdulmutallab specifically requested that his attorneys meet with officials to discuss his SAMs on his behalf.  Mr. Abdulmutallab's attorneys were not contacted for such a meeting.  After submitting his form, Mr. Abdulmutallab received no further information regarding his SAMs until he was presented with the finalized 2018 SAMs in March.

**H.    Mr. Abdulmutallab's Right to Familial Relationships**

139.    BOP policy states that inmates at ADX "have the right to visit and correspond with family members and friends . . . in keeping with Bureau rules and institution guidelines."  ADX Admission and Orientation Handbook (November 2008), at 2.

140.    Under his SAMs, Mr. Abdulmutallab is permitted to visit and correspond with no one other than his attorneys and his immediate family—narrowly defined as parents, siblings, children, and grandparents.  Mr. Abdulmutallab is not permitted to communicate with his thirteen nieces and nephews, many of whom are young children.

141.    Although Mr. Abdulmutallab is allowed to speak with his family on the phone three times a month, these calls are frequently cancelled without notice either Mr. Abdulmutallab or his family.  These frequent, unannounced cancellations cause stress and anxiety for both Mr. Abdulmutallab and his family.

142.    On information and belief, prisoners subjected to SAMs, such as Mr. Abdulmutallab, are each permitted to write one letter per week and that letter and its

contents can be addressed only to one person, such as prisoner's father or mother but not both, or that letter will not be permitted to be sent.  Prisoners not subjected to SAMs are not similarly restricted when writing letters.  Thus, the SAMs deprive Mr. Abdulmutallab of a significant First-Amendment interest.

143.    Mr. Abdulmutallab has had more than 26 letters rejected by ADX solely based on the unconstitutional restraint on communication due to the SAMs.

144.    Some of the individuals whose letters have been rejected by ADX were people Mr. Abdulmutallab had previously communicated with while incarcerated at FCI Milan.

145.    Mr. Abdulmutallab's relationships with his family members have suffered great harm as a result of the prohibition against communicating with extended family members, especially his young nieces and nephews, and as a result of the excessive delays imposed on Mr. Abdulmutallab's incoming and outgoing mail.

## I.    The Right to Read Books

146.    BOP regulations state that inmates have the right to "a wide range of reading materials for educational purposes and for [their] own enjoyment." 28 C.F.R. § 540.70 (2007).  The regulations specify that this includes "magazines and newspapers sent from the community, with certain restrictions." *Id*.  Further, BOP regulations permit inmates to receive subscriptions without obtaining prior approval, with limited exceptions in the case of publications containing nudity or sexually-explicit material. *See id*.

147.   Whether due to the SAMs or other factors, Defendants have censored books coming into ADX for Mr. Abdulmutallab.  For example, on July 26, 2017, two non-sexually-explicit and otherwise unobjectionable books were delivered to ADX for Mr. Abdulmutallab by amazon.com: The Life-Changing Magic of Tidying Up: The Japanese Art of Decluttering and Organizing, by Marie Kondo, and 168 Hours: You Have More Time Than You Think, by Laura Vanderkam.  As of the filing of this Complaint, Mr. Abdulmutallab has not received these books, nor has he been given any reason why Defendants are refusing to allow him to read them.

**J.     The Right to Legal Counsel from an Attorney of Choice**

148.   BOP regulations state that federal inmates have the right to "legal counsel from an attorney of your choice by interviews and correspondence." 28 C.F.R. § 541.12 (2007).  Under the SAMs, Mr. Abdulmutallab is not permitted to write to lawyers or law clinics to request legal advice, assistance, or representation.  He is restricted to communicating with legal counsel from pre-approved attorneys who have signed a document affirming the SAMs.  In practice, Mr. Abdulmutallab is not allowed to communicate with an attorney unless that attorney has been approved by the U.S. Attorney's Office for the Eastern District of Michigan.

149.   The government's requirement that an attorney agree to a SAMs affirmation before the attorney can even read a letter or talk to a SAMs inmate regarding a legal matter constitutes an unreasonable prior restraint on free speech.

150.    At least two incoming letters from attorneys to Mr. Abdulmutallab were censored and disallowed by BOP solely due to his SAMs restrictions.

151.    All attorneys are officers of the court and should be treated in such manner. For example, the government may wish to enclose the unopened envelope containing Mr. Abdulmutallab's letter in its own envelope with a letter explaining that this communication is from a SAMs designated inmate, further explaining it is requested that the attorney does not forward anything to another person or communicate messages to others.  Banning any initial consultation between a SAMs prisoner and his possible future lawyer is unreasonable, constitutes a prior restraint, and violates the First Amendment.

## K.    Communication with the News Media

152.    BOP regulations also state inmates are permitted to correspond with members of the news media, as long as such communications are "in keeping with Bureau rules and institution guidelines."  *See* 28 C.F.R. § 540.20 (2007).  The SAMs prohibit Mr. Abdulmutallab from communicating with the media—either directly or through his attorney.  This is a blanket prohibition of all contact by any means.

153.    The SAMs unreasonably restrict Mr. Abdulmutallab from communicating with the media and commenting on matters of public interest.  There is no law or regulation have that inmates are precluded from providing comments on political and non-political issues.  This restriction imposed by the SAMs is unreasonable and overly broad in violation of the First Amendment.

## L.    Lack of Meaningful Review

154.    The BOP's Administrative Remedy procedure does not afford Mr. Abdulmutallab a meaningful review of his claims in connection with the SAMs.

155.    The SAMs are renewed at the discretion of Defendant Sessions with input from federal prosecutors, the FBI, and other officials at the U.S. Department of Justice. The BOP has limited input and no control over whether SAMs are imposed or renewed. The BOP's responsibility is restricted to the implementation of the SAMs.

156.    Mr. Abdulmutallab has not been given meaningful notice of the reasons for the renewals of his SAMs, nor an opportunity to appear before the decision-makers, nor a meaningful explanation regarding why his SAMs are continually renewed.

157.    The placement of Mr. Abdulmutallab in long-term segregation has been delegated by Congress to the BOP and not to federal prosecutors or the FBI.   However, in reality, Defendant Sessions, federal prosecutors, and the FBI decide Mr. Abdulmutallab's continued confinement in segregation through Defendant Sessions's continual renewal of Mr. Abdulmutallab's SAMs.

158.    The renewals of Mr. Abdulmutallab's SAMs were arbitrary and capricious and without penological justification.

**M.    No Meaningful Opportunity to Participate in ADX Step-Down Program**

159.    ADX presently operates two remediation programs: ADX Step-Down Program for the general population at ADX and the H-Unit Special Security Unit Program for H-Unit inmates.  As a result of Mr. Abdulmutallab's SAMs, he will never be

able to participate in ADX Step-Down Program or transfer out of ADX like other inmates.

160.    As a result of his SAMs, Mr. Abdulmutallab is ineligible to participate in ADX Step-Down Program.

161.    In 2008, ADX promulgated a separate internal program for H-Unit known as the Special Security Unit Program.  This program provides for three phases through which an inmate, through good behavior, may earn greater privileges and less restrictive conditions of confinement while remaining within H-Unit under SAMs.  However, the program does not provide an opportunity for the inmate to be transferred out of H-Unit.

162.    Phase One is a baseline phase that is the most restrictive.  Phase one inmates are permitted two non-legal phone calls per month, access to a commissary list, use of art and hobby craft items, escorted shower time on the inmate's range three times each week, and have access to a minimum of ten hours of out-of-cell recreation per week.

163.    Phase Two inmates are allowed three non-legal phone calls per month, access to an expanded commissary list use of additional art and hobby craft items, unescorted showers five times per week, and access to a minimum of ten hours of out-of-cell recreation per week.

164.    Phase Three inmates are permitted to spend a minimum of one and a half hours per day on the range with as many as four other inmates, five days a week.  They

are not restrained or escorted while on the range, eat one meal together, engage in recreational activities together, and may shower at any time they are on the range.

165.    Consideration for advancement within the H-Unit Special Security Program includes such factors as "safety concerns, length of sentence, disciplinary record, history of assaultive/disruptive behavior, and escape potential."  In addition, "sanitation, willingness to participate in or cooperate with institutional programs or procedures, interaction with other inmates as well as positive rapport with staff are elements that will be used to evaluate placement in each phase."

166.    Based upon these factors, the H-Unit Review Committee makes an evaluation, on information and belief, every six months as to whether each inmate within the H-Unit Special Security Program is qualified to advance to the next phase.

167.    The H-Unit Review Committee is not empowered to authorize the removal of an inmate from H-Unit.  Inmates in H-Unit are not eligible for entry into the ADX Step-Down Program that is available to inmates in ADX's so-called "general population" solitary confinement units.

168.    Advancement to Phase Three of the H-Unit Special Security Program is conditioned upon the granting of a request by the participating inmate and the H-Unit Review Committee to the Office of General Counsel of the BOP for a modification of the SAMs imposed on that inmate consistent with the greater privileges allowed in Phase Three of the program.  For Mr. Abdulmutallab to be allowed into Phase Three, his SAMs

would need to be modified to allow him to have contact with other inmates during recreation.

169.    According to the BOP's own policy, "[t]he review by the Committee is not a hearing.  The inmate is not entitled to be present, to have counsel, or to call witnesses." ADX Institutional Supplement 5321.07(3)I(II)(c)(7) (May 15, 2015).

170.    No individual within the BOP has the power to modify or remove the SAMs restrictions on Mr. Abdulmutallab.  Mr. Abdulmutallab's 2018 SAMs state that "[i]f there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are more restrictive than usual USMS/BOP/DF policies, then the SAM shall control."

171.    Mr. Abdulmutallab has participated in Phase One of the program and is presently in Phase Two of the program.  On information and belief, Mr. Abdulmutallab has satisfied all requirements for progression to Phase Three of the program and has been reviewed and recommended for progression to Phase Three by the BOP on two occasions.  He has been rejected from the program twice, despite the BOP's positive recommendations.

172.    On information and belief, this denial is based upon Mr. Abdulmutallab's SAMs.  He has repeatedly asked that his SAMs be modified to permit him to participate in Phase Three, but his requests have been denied.

173.    According to BOP policy, an inmate may appeal the decision through the BOP's Administrative Remedy Program.  ADX Institutional Supplement 5321.07(3)I(II)(c)(7) (May 15, 2015).  However, as noted, the BOP does not impose and cannot modify Mr. Abdulmutallab's SAMs.

174.    Mr. Abdulmutallab has been unable to obtain an explanation as to why his requests for modification or removal of the SAMs cannot be approved, other than that the reasons for his initial placement under SAMs have not been sufficiently mitigated.

175.    Having never been provided meaningful notice of the reasons for his initial placement under SAMs, the reasons for the annual denial of his request for removal and/or modification, or the reasons for his failure to be advanced to Phase Three, Mr. Abdulmutallab is being wholly prevented from addressing the reason for his placement under SAMs.

176.    Upon information and belief, the initial decision to place Mr. Abdulmutallab under SAMs restrictions, as well as the decision each year to renew the SAMs, were, are, and continue to be made by one or more individuals, groups of individuals, agencies, offices, or task forces associated with the U.S. Department of Justice, federal law-enforcement agencies, or agencies of the U.S. intelligence community, whose identities are unknown to Mr. Abdulmutallab.  These individuals are joined in this action as Defendants John Does 1 through 20.

177.    Further, the requirement for modification of the SAMs as a precondition for advancement to Phase Three of the H-Unit Special Security Unit Program, and under circumstances where the existence of the SAMs effectively blocks entry into ADX Step-Down Program, renders ADX Step-Down Program unavailable and a sham as applied to Mr. Abdulmutallab.

178.    Mr. Abdulmutallab has not been accepted into ADX Step-Down Program even though other inmates who have been incarcerated at ADX for less time than Mr. Abdulmutallab have been accepted into ADX Step-Down Program.

179.    Mr. Abdulmutallab receives a "review" of his placement.  Currently, these reviews are a brief conversation with a case manager, Ms. Kinney, which do not provide Mr. Abdulmutallab any guidance on the reasons for his placement.  For example, his most recent review was a conversation lasting a few minutes with a brand new case manager, Ms. Kinney, who came to his cell door and discussed his fines and emergency contacts and left, without even mentioning Phase Three.  The review Mr. Abdulmutallab received previously was conducted by a different case manager who told him he needed to take more educational courses to be considered for Phase Three.  Following that case manager's guidance, Mr. Abdulmuttalab completed three educational courses and is currently enrolled in three others.  However, in the most recent review, Ms. Kinney, did not acknowledge with Mr. Abdulmutallab's educational progress.

**N.    The SAMs Prohibit Mr. Abdulmutallab from Practicing His Sincerely Held Religious Beliefs.**

### *Mr. Abdulmutallab's Sincerely Held Religious Beliefs*

180.    Mr. Abdulmutallab is a devout Muslim.  His religious beliefs have been constant and unwavering throughout his life, including his years spent incarcerated.

181.    As a devout Muslim, Mr. Abdulmutallab follows the five pillars of Islam, to the extent he can, while he is incarcerated.  The five pillars of Islam include: (1) declaration that there is no God except Allah and that the Prophet Muhammad is Allah's messenger; (2) prayer five times a day; (3) fasting during Ramadan; (4) zakat (charity); and (5) haj (pilgrimage to Mecca) if financially and physically able to do so.

182.    Mr. Abdulmutallab believes that the Qur'an is the word of Allah.

### *Defendant BOP Has Substantially Burdened Mr. Abdulmutallab's Ability to Participate in Daily Group Prayer*

183.    As a Sunni Muslim, Mr. Abdulmutallab believes that prayer is a religious requirement.

184.    Whenever possible, Muslims will pray together during the five daily prayers.

185.    These daily prayers are very short and take only a few minutes to complete. The prayers follow a prescribed sequence of actions and words. Prisoners do not converse among themselves during the prayers.

186.    Defendant BOP completely prohibits Mr. Abdulmutallab from praying with other Muslims.

187.    Mr. Abdulmutallab must conduct his prayers alone in his cell while white-supremacist inmates in H-unit harass him.

188.    Mr. Abdulmutallab desires to be able to engage in congregate prayer for all daily prayers that take place during the time that he can be out of his cell.

189.    The prohibition on Mr. Abdulmutallab's ability to participate in daily group prayers imposes a substantial burden on his exercise of his religion, Islam.

190.    The Bureau of Prisons allows Muslim inmates in its highly-restrictive Communication Management Units to pray together in groups.

191.    Defendant BOP allows ADX prisoners to interact with one another during their recreation time.

192.    Defendant BOP allows ADX prisoners—up to five at a time—to interact with each other while they are in individual cages for various groups, like group therapy, education courses, or health and wellness programs.  In these cages, which are all together in the same small gymnasium at ADX, prisoners can see and talk to each other.

### Defendant BOP Has Denied Mr. Abdulmutallab Regular Meetings with an Imam.

193.    An Imam is the primary Islamic religious leader who leads others in formal prayers; outlines lessons from the Qur'an by explaining its meaning and application in daily life; gives advice and counseling on personal, family, and financial issues; and builds Muslim community and fellowship.

194.    Islamic law mandates regular consultation with an Imam to ensure compliance with religious values in daily life.

195.    Mr. Abdulmutallab sincerely believes that an Imam should/must provide him with much needed religious advice, both in general and specifically concerning the complicated spiritual challenges that prison presents.

196.    Defendant BOP does not have a full-time imam employed at ADX, despite having full-time Christian and Jewish religious leaders employed there.

197.    Defendant BOP has only rarely made a contract imam available to meet with Muslim prisoners incarcerated at ADX.

198.    Mr. Abdulmutallab has not had regular access to an imam at ADX in several years.

199.    The BOP has employed and continues to employ full-time Chaplains for other religious groups, including Christian Chaplains and a Jewish Rabbi, at the Florence Correctional Complex (FCC), of which ADX is a part.  Jewish and Native American prisoners at ADX have been allowed visits with volunteers from outside the prison who are members of the same faith.

200.    On information and belief, Defendant BOP has not been able to fill postings for a full-time imam at the Florence Correctional Complex (where ADX is located) because the BOP's hiring criteria for full-time chaplains of any faith group are biased towards applicants with a Judeo-Christian background.  On information and belief,

Defendant BOP knows that Muslim applicants will generally lack the required "practicum" experience because such experience is not generally required by Muslim religious leaders in the community.

**O.     Harassment by Correctional Officers and Inmates Due to Mr. Abdulmutallab's Sincerely Held Religious Beliefs.**

201.    Since his arrival at ADX, Mr. Abdulmutallab has continuously been subjected to degrading behavior from correctional officers due to his religious beliefs.

202.    Mr. Abdulmutallab is regularly subjected to insulting comments from correctional officers and inmates about Islam, including expletives to describe Allah and Prophet Muhammad.  The deplorable comments include a sacrilegious process of describing vial sexual acts between Allah and Prophet Muhammad.

203.    Certain correctional officers at ADX have deliberately harassed Mr. Abdulmutallab both directly and by failing to intervene when other inmates have abused him.

204.    ADX houses inmate members of white supremacist gangs, including within H-Unit.

205.    Since Mr. Abdulmutallab's arrival in H-Unit in 2012, inmate members of white supremacist gangs have persistently mocked and insulted every aspect of his sincerely held religious beliefs.

206.    During Mr. Abdulmutallab's prayer times, white supremacist gang member inmates in H-Unit at ADX will purposefully disrupt the prayers by banging on the walls.

207.    Inmate members of white supremacist gangs who are incarcerated in ADX make insulting comments about Islam including: using expletives to describe the Prophet Muhammad and detailing sexual acts between God and the Prophet Muhammad.

208.    Inmate members of white supremacist gangs who are incarcerated in ADX continuously taunt and whistle at Muslim inmates including Mr. Abdulmutallab during prayer time.

209.    Although the correctional officers at ADX have a duty to protect inmates in their care, certain correctional officers themselves have white supremacist leanings and sympathies and are not only complicit with this humiliating treatment of Muslims by white supremacist inmates but also affirmatively participate in it.

210.    During Mr. Abdulmutallab's prayer times, some BOP correctional officers purposefully disrupt the prayers by making loud noise, such as by running a machine or moving a cart of food trays nearby in a particularly noisy manner.

211.    Defendant BOP staff regularly interfere with Mr. Abdulmutallab's ability to use the administrative remedy process to grieve his conditions of confinement by returning his administrative remedies for arbitrary reasons, slowing down the processing of his requests for administrative remedies, and failing to respond to them.

**P.      The Illegal Practice of Responding to Nonviolent and Passive Hunger Striking with Violent and Brutal Force-Feeding**

212.    Federal prisoners like Mr. Abdulmutallab are required to follow complex administrative remedy procedures when seeking formal review of a complaint relating to their conditions of confinement.

213.    However, as described above, because the BOP has no power or authority to remove or modify Mr. Abdulmutallab's SAMs, the BOP's administrative-remedy process cannot address and remedy Mr. Abdulmutallab's concerns regarding his SAMs.

214.    The overwhelming majority of prisoners in the United States—including the overwhelming majority of federal prisoners in the United States—are able to disclose and expose any inhumane and abusive treatment and conditions of confinement they experience through open communications with third parties, including without limitation international human rights entities, non-profit organizations concerned about human rights and prisoners' rights, and members of the media.  By contrast, prisoners under SAMs such as Mr. Abdulmutallab are prohibited from communicating with any such organizations or individuals to draw attention and seek outside assistance for the inhumane and abusive treatment and conditions of confinement they experience at ADX.

215.    SAMs, combined with long-term indefinite solitary confinement is an extremely harsh and repugnant form of isolation that poses a grave risk of psychological and physical harm to all prisoners.

216.    Left with no other option to voice their serous concerns, inmates like Mr. Abdulmutallab therefore sometimes engage in hunger strikes to protest their unconstitutional and illegal conditions of confinement.

217.    Hunger strikes have long been used as a means of nonviolent protest when a person has no other recourse to challenge grave injustices.

218.    In August 2012, Mr. Abdulmutallab participated in a hunger strike to protest correctional officers' and inmates' persistent abuse and harassment described in this Complaint.

219.    After Mr. Abdulmutallab refused food for 72 hours, Officers Wadas and Lozano removed him from his cell and told him he was being taken to "medical" for a health assessment.

220.    Mr. Abdulmutallab told Officers Wadas and Lozano that he did not want to be medically assessed.

221.    Officers Wadas and Lozano forcefully removed Mr. Abdulmutallab from his cell, threw him onto the concrete floor, shackled his hands painfully behind his back, and shackled his legs.  SIS Officer Oliver and other officers then carried Mr. Abdulmutallab against his will to the medical unit at ADX.

222.    When he again refused to be medically assessed, Mr. Abdulmutallab was taken to Range 13, a small unit that is the most isolated and high-security area of ADX.

223.    The next day, ADX Force Team took Mr. Abdulmutallab to medical to begin force-feeding procedures against his will.

224.    After Mr. Abdulmutallab verbally protested the force-feeding, the officers decided against force-feeding him.  They put Mr. Abdulmutallab in an empty cell in the medical unit for another two weeks.

225.    After the two-week period, Mr. Abdulmutallab was then force-fed.  He was placed in a six-point restraint chair and forcibly strapped down tightly at his hands, legs, waist, and shoulder.

226.    The ADX Force Team surrounded Mr. Abdulmutallab and held his head in place so he could not avoid the forcible placement of the feeding tube.

227.    BOP medical staff then thrust or shoved a nasogastric feeding tube through Mr. Abdulmutallab's nose and down his throat against his will.

228.    A very large amount of liquid nutritional supplement was fed through the nasogastric feeding tube in a very short amount of time.  This made Mr. Abdulmutallab feel like he was drowning, and it caused him to vomit.

229.    The speed of the force-feeding process used on Mr. Abdulmutallab amounted to "pumping," a form "Water Cure" torture, which has been practiced since the Middle Ages.  "Pumping," featured prominently in the Spanish Inquisition, was also used

by the Imperial Japanese Army against soldiers during World War II, and has historically been considered "one of the most fearful tortures."[24]

230.    Mr. Abdulmutallab was force fed three more times that week before he decided to end his hunger strike.

231.    In October 2012, Mr. Abdulmutallab started to hunger strike to protest the continued harassment by correctional officers and inmates and the fact that his SAMs prohibited him from communicating by any means with his sister Maryam and his nieces and nephews.

232.    In response to this hunger strike, BOP Defendants force fed Mr. Abdulmutallab more than four times against his will and then sent him to Range 13 for a month and a half.  These responses were to punish Mr. Abdulmutallab from engaging in hunger striking as a form of nonviolent protest of his inhumane conditions of confinement and the unconstitutional communication restrictions placed on him by the SAMs.

233.    In July 2015, Mr. Abdulmutallab again went on a hunger strike to protest the continued harassment by correctional officers and inmates and the fact that his SAMs prohibited him from communicating by any means with his sister Maryam and his nieces and nephews.

234.    In response to this July 2015 hunger strike by Mr. Abdulmutallab, the ADX Force Team arrived to remove Mr. Abdulmutallab from his cell and take him to be force

[24] Darius Rejali, Torture and Democracy (2007) at 279-80.

fed.  Faced with the prospect of yet again being brutally forcibly extracted from his cell by the Force Team, Mr. Abdulmutallab submitted to being cuffed and shackled and removed from his cell.

235.    Mr. Abdulmutallab was again placed in a six-point restraint chair and forcibly strapped down tightly at his hands, legs, waist, and shoulders.

236.    The ADX Force Team again surrounded Mr. Abdulmutallab and forcibly held his head while BOP medical staff inserted the feeding tube against Mr. Abdulmutallab's will.

237.    Unfortunately, the tube was inserted in the wrong place, into his trachea and down into his lungs, rather than through his esophagus and into his stomach.  This caused Mr. Abdulmutallab to feel like he was being suffocated.

238.    Because of the incorrect placement of the tube, Mr. Abdulmutallab subsequently developed serious breathing problems.

239.    In March 2016, Mr. Abdulmutallab was unable to breathe properly.

240.    Despite the fact that Mr. Abdulmutallab continually notified the officers that he was having trouble breathing, Officer Lancaster, Officer Garcia-Tunarod, and other, medical personnel at ADX did not consider his breathing problem serious enough to warrant treatment.

241.    In addition, the officers deliberated restricted Mr. Abdulmutallab's access to commissary to purchase medication to treat his serious breathing problems.

242.   After a week of suffering severe shortness of breath, Mr. Abdulmutallab was finally allowed to purchase medicine to treat his breathing problem.

243.   On April 9, 2018, Mr. Abdulmutallab went on hunger strike for almost two days because of the restrictions he faces and the ongoing harassment he experiences from Defendant BOP officials.  According to BOP Officer Tsuffis, the BOP classified him as a hunger striker when he refused to eat three meals in a row.  Pursuant to their procedures as to prisoners on hunger strikes, BOP officials took Mr. Abdulmutallab out of his cell and performed a shake down of his cell on April 10, 2018.  Mr. Abdulmutallab was seen by BOP medical staff regarding the hunger strike.  On information and belief, Mr. Abdulmutallab lost weight as a result of this hunger strike.

244.   By policy, Defendant BOP conducts shakedowns of every prisoner it deems to be hunger striking.

245.   The consensus of the United Nations Special Rapporteurs, the World Medical Association, the American Medical Association, bioethicists, and human-rights organizations is that force-feeding prisoners falls within the definition of torture and constitutes cruel, inhumane, and degrading treatment or punishment.

246.    According to international law, force-feeding of prisoners under restraint and without proof of a life-threatening decrease in state of health constitutes "treatment of such a severe character warranting the characterization of torture."[25]

247.    On information and belief, the nutritional supplement forced into Mr. Abdulmutallab on each of these occasions was non-halal, or haram.

248.    Mr. Abdulmutallab does not want to die, but he is faced with a "Hobson's choice."  He may either continue to submit passively to his unconstitutional conditions of confinement—lingering in a twilight of half-death—or take the only peaceful course available to him to protest his situation, in the hope that he can obtain improvement in his daily living conditions and be confined under conditions that meet basic human standards of decency.

249.    Hunger striking is his only recourse.

250.    Indeed, Mr. Abdulmutallab has a sincerely-held religious belief that given his inability to practice other tenets of Islam he must hunger strike to express his fidelity to his faith.

251.    Being forcibly made to end his hunger strikes substantially burdens Mr. Abdulmutallab's right to exercise his religion.

252.    Given the many ways in which the SAMs, BOP policies, and ongoing harsh conditions of confinement imposed on Mr. Abdulmutallab prevent him from

---

[25] *Nevmerzhitsky v. Ukraine*, App. No. 548255/00, Final Judgment, ¶ 98, Dec. 10, 2005 (Eur. Ct. H.R.), *available at* https://www.legal-tools.org/doc/6420db/pdf (last visited on October 18, 2017).

communicating with family members and others and substantially burden his practice of his religion, Mr. Abdulmutallab anticipates that he will likely be forced to hunger strike again in the future.

253.    In addition to unconstitutionally force-feeding Mr. Abdulmutallab against his will for hunger striking, officers also retaliate against him for hunger striking by frequently "shaking down" his cell for no reason, intentionally throwing away his meals and food purchased at commissary, severely limiting or denying him access to the phone, canceling recreation without notice, denying him access to the shower, refusing him access to the laundry, and denying him access to other regular H-unit programs.

254.    Since Mr. Abdulmutallab filed this lawsuit, his recreation time has been regularly cancelled for arbitrary reasons even when other in his Unit or recreation group have been allowed to recreate.

255.    The FCC Florence Complex Supplement on "Hunger Strikes," under "Refusal to Accept Treatment," states that "[p]rior to treatment being administered against the inmate's will, every reasonable effort must be made and documented to convince the inmate to voluntarily accept treatment."  FCC Florence CS 5562.05(c)(d)(2) (Sept. 13, 2012).

256.    The FCC Florence Complex Supplement on "Hunger Strikes" further states that "[i]f after reasonable efforts, or in an emergency preventing such efforts, *and a medical necessity for treatment of a life threatening situation exists*, treatment may be

administered against the inmate's will."  FCC Florence CS 5562.05(c)(d)(3) (Sept. 13, 2012) (emphasis added).

257.    These procedures were not followed in the BOP's repeated force-feedings of Mr. Abdulmutallab.  The BOP did not make reasonable efforts to resolve the reasons for Mr. Abdulmutallab's hunger strikes.  And no life-threatening situation existed during any of the occasions Defendant BOP officials forcibly restrained Mr. Abdulmutallab and pumped him full of nutritional supplement.

258.    Upon information and belief, force-feeding of hunger-striking BOP prisoners take places primarily at ADX.

259.    Upon information and belief, within ADX, hunger-striking and force-feeding takes place primarily with respect to prisoners assigned to H-Unit who are under SAMs.

260.    Upon information and belief, within ADX, the prisoners who hunger strike and are force-fed are disproportionately Muslims.

261.    At BOP facilities other than ADX, legitimate concerns of prisoners about their conditions of confinement do not generally reach the level of desperation that causes a prisoner to hunger strike, because such legitimate prisoner concerns are resolved by BOP staff.

262.    One of the reasons the legitimate concerns of Muslim prisoners incarcerated in H-Unit under SAMs are not resolved by BOP staff or other federal

officials before the prisoners reach the level of desperation that they go on hunger strike is because of the veil of silence and secrecy resulting from the operation of the SAMs.

263.   One of the reasons the legitimate concerns of Muslim prisoners incarcerated in H-Unit under SAMs are not resolved by BOP staff or other federal officials before the prisoners reach the level of desperation that they go on hunger strike is because BOP staff and federal officials are more responsive to the expressed concerns of white supremacist inmates under SAMs as compared to the expressed concerns of Muslim inmates under SAMs.

264.   Abuse of prisoners thrives in secrecy.

265.   Holding prisoners including Mr. Abdulmutallab under severe communication restrictions such as SAMs increases the frequency and severity of illegal practices, inhumane abuse, and violations of constitutional and statutory rights regarding those prisoners' conditions of confinement.

266.   Allowing prisoners open communication with the outside world about their conditions of confinement within the BOP would decrease and possibly eliminate the perceived need for Muslim prisoners such as Mr. Abdulmutallab to engage in hunger striking to protest those conditions of confinement, because the open flow of information naturally leads to voluntary remedial measures and humanitarian and legal reforms.

**Q.     Psychological Harms of Prolonged Solitary Confinement**

267.    The devastating psychological and physical effects of prolonged solitary confinement are well documented by social scientists.  Prolonged solitary confinement causes prisoners significant mental harm and places them at grave risk of even more devastating future psychological harm.

268.    Mr. Abdulmutallab is also unable to benefit from the limited psychological services offered by Defendant BOP at ADX because the officials who work in psychological services at ADX also harass him.  For example, psychology services officials will disturb Mr, Abdulmutallab's prayer by making noises and mocking faces at him.

269.    Social interaction is critical for mental and physical health and is a basic human need.  Deprivation of social interaction has been shown to impact mortality rates and result in significant physical as well as emotional harm.[26]

270.    Research has demonstrated that prolonged solitary confinement causes a persistent and heightened state of anxiety and nervousness, headaches, insomnia, lethargy or chronic fatigue (including lack of energy and lack of initiative to accomplish tasks), nightmares, heart palpitations, and fear of impending nervous breakdowns.  Other documented effects include obsessive ruminations, confused thought processes,

---

[26] *See* Jane Brody, *Social Interaction Is Critical for Mental and Physical Health*, The New York Times (June 12, 2017), https://www.nytimes.com/2017/06/12/well/live/having-friends-is-good-for-you.html (last accessed April 9, 2018) (collecting research regarding the physical and mental effects of deprivation of social interaction).

oversensitivity to stimuli, irrational anger, social withdrawal, hallucinations, violent

fantasies, emotional flatness, mood swings, chronic depression, feelings of overall

deterioration, and suicidal ideation.  Individuals in prolonged solitary confinement

frequently fear that they will lose control of their anger, and will thereby be punished

further.

271.    In Justice Breyer's dissent from the denial of an application for stay of

execution in *Ruiz v. Texas*, 16-7792, he discusses the Court's jurisprudence regarding the

dangers of extended solitary confinement: "The Court pointed to studies showing that '[a]

considerable number of the prisoners fell, after even a short confinement, into a semi

fatuous condition, from which it was next to impossible to arouse them, and others

became violently insane; others still, committed suicide; while those who stood the ordeal

better were not generally reformed, and in most cases, did not recover sufficient mental

activity to be of any subsequent service to the community.  It became evident that some

changes must be made in the system,' as 'its main feature of solitary confinement was

found to be too severe.'"

272.    Mr. Abdulmutallab suffers from and exhibits some of these symptoms.

While these symptoms are reported by people who have suffered from being placed in

solitary confinement for days, months, or a few years, they become more pronounced and

cause greater pain and suffering when one is incarcerated in these conditions for many

years without any meaningful hope of release, as Mr. Abdulmutallab is.

273.    Mr. Abdulmutallab also suffers from significant concentration and memory problems.

274.    Mr. Abdulmutallab experiences life in the H-Unit at ADX as a struggle to avoid becoming mentally ill.  Faced with extraordinarily harsh conditions of long-term solitary confinement that prevent daily physical contact with other human beings, severely restrict communication with the outside world, and inhibit regular social communication within prison, he has developed psychological defense mechanisms that dampen and deaden his emotions.

275.    Mr. Abdulmutallab experiences a range of other psychological symptoms stemming from his solitary confinement at FCI Milan, in H-Unit at ADX, and in Range 13 at ADX, including hallucinations, anxiety, hypersensitivity, severe mood swings, and panic attacks.

276.    These psychological symptoms are precisely those reported in the literature about individuals placed in prolonged solitary confinement.  Mr. Abdulmutallab's symptoms are very similar to those described in psychological literature about the long-term effects of severe trauma and torture.

**R.      International Standards Regarding Torture and Cruel, Inhumane or Degrading Treatment**

277.    In light of the well-documented harms described above, there is an international consensus that the type of prolonged solitary confinement practiced at ADX violates international human rights standards and norms standards of humanity and human dignity.

278.    International human rights organizations and bodies, including the United Nations, have condemned indefinite or prolonged solitary confinement as a human rights abuse that can amount to torture.

279.    As just one example, in August 2011, the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (United Nations Special Rapporteur on Torture and CIDT) concluded that the use of solitary confinement is acceptable in only exceptional circumstances, and that its duration must be as short as possible and for a definite term that is properly announced and communicated.  Mr. Abdulmutallab's prolonged detention meets none of these criteria.

280.    The United Nations Special Rapporteur on Torture and CIDT concluded that prolonged solitary confinement constitutes torture or cruel, inhuman or degrading treatment or punishment and is prohibited by the International Covenant on Civil and Political Rights (ICCPR) and the Convention Against Torture.  The United Nations Special Rapporteur on Torture and CIDT concluded that even 15 days in solitary confinement constitutes a human-rights violation.

281.   The view of the United Nations Special Rapporteur on Torture and CIDT regarding prolonged solitary confinement comports with standards set forth by the Istanbul Statement on the Use and Effects of Solitary Confinement, the ICCPR Human Rights Committee, and the United Nations Office of the High Commissioner for Human Rights.

282.   Repeated requests by the United Nations Special Rapporteur on Torture and CIDT for full and unfettered access to ADX and other Defendant BOP institutions where inmates under SAMs are incarcerated have been denied.[27]

283.   Mr. Abdulmutallab has been held in solitary confinement for more than 2000 days.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Fifth Amendment – Denial of Procedural Due Process in Transfer to ADX
### (against Defendants Sessions and BOP)

284.   Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

285.   Mr. Abdulmutallab brings this claim against Defendants Sessions and the BOP.

---

[27] Allard K. Lowenstein International Human Rights Clinic & The Center for Constitutional Rights, *The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons* (September 2017) at 27.

286.    By transferring Mr. Abdulmutallab to ADX without meaningful notice, a hearing, the ability to present evidence to contest that transfer, regular review of his ongoing placement at ADX, notice of the projected duration of his confinement at ADX, and notice of any criteria for release, Defendants Sessions and the BOP, acting under color of law and their authority as federal officers, are intentionally or recklessly subjecting Mr. Abdulmutallab to an atypical and significant hardship in relation to the ordinary incidents of prison life, and are depriving him of liberty without due process of law and without legitimate penological purpose, in violation of the Fifth Amendment to the United States Constitution.

287.    Mr. Abdulmutallab has no effective means of enforcing his Fifth Amendment due-process rights other than by seeking declaratory and injunctive relief from the Court.

288.    As a result of Defendants' unlawful conduct, Mr. Abdulmutallab has suffered and will continue to suffer emotional distress, psychological injury, and destruction of family ties.

### SECOND CLAIM FOR RELIEF
### Violation of the First Amendment – Denial of Free Speech
### (against all Defendants)

289.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

290.    Mr. Abdulmutallab brings this claim against all Defendants.

291.     Under the Free-Speech Clause of the First Amendment to the United States

Constitution, Mr. Abdulmutallab has the right to communicate with other persons.

292.     By imposing, renewing, and implementing the SAMs against Mr.

Abdulmutallab, Defendants have prohibited and are continuing to prohibit him from

engaging in communications with a wide array of people, including close family

members such as his thirteen nieces and nephews.

293.     As a result of the SAMs imposed on Mr. Abdulmutallab, Defendants are

censoring and restricting his outgoing correspondence to a degree not consistent with the

restrictions applicable to other high-security inmates not placed under SAMs.

294.     Defendants are censoring and restricting Mr. Abdulmutallab's

correspondence to a degree greater than is necessary to the protection of the

governmental interests of security, order, and rehabilitation.

295.     Defendants are censoring and restricting Mr. Abdulmutallab's

correspondence to a degree greater than is reasonably necessary to protect persons against

the risk of acts of violence or terrorism.

296.     Mr. Abdulmutallab is entitled to immediate restoration of his First-

Amendment right to communicate with others except to the extent Defendants can

demonstrate that restrictions upon that right are reasonably necessary to further a

legitimate penological interest.

297.    Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his right to free speech under the First Amendment other than by seeking declaratory and injunctive relief from the Court.

298.    As a result of Defendants' unlawful conduct, Mr. Abdulmutallab has suffered and will continue to suffer harm.

**THIRD CLAIM FOR RELIEF**
**Violation of the First Amendment – Denial of Free Association**
**(against all Defendants)**

299.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

300.    Mr. Abdulmutallab brings this claim against all Defendants.

301.    In subjecting Mr. Abdulmutallab to the SAMs and unreasonably and excessively restricted access to visits and to telephone calls with family members, and imposing arbitrary and unjustified rules regarding the scheduling of such communication, Defendants, without legitimate penological purpose, and acting under color of law and their authority as federal officers, are intentionally or recklessly interfering with Plaintiff's right to free speech and association in violation of the First Amendment to the United States Constitution.

302.    Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his First-Amendment right to free association other than by seeking declaratory and injunctive relief from the Court.

303.    As a result of Defendants' unlawful conduct, Mr. Abdulmutallab is

suffering psychological injury, emotional distress, and destruction of their familial

relationships.

## FOURTH CLAIM FOR RELIEF
### Violation of the First Amendment – Deprivation of Familial Association
### (against all Defendants)

304.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of

this Complaint as if set forth fully herein.

305.    Mr. Abdulmutallab brings this claim against all Defendants.

306.    The First Amendment right of association includes the specific right to

associate with family members and engage in family relationships.

307.    Mr. Abdulmutallab has the right under the First Amendment to associate

with and engage in family relationships with all members of his family, not just those

"immediate family members" described in his SAMs.

308.    In particular, Mr. Abdulmutallab has a First-Amendment right to associate

with his nieces and nephews.

309.    Mr. Abdulmutallab's SAMs infringe on his right of familial association,

and this infringement is not reasonably related to any legitimate penological interest.

310.    Mr. Abdulmutallab has no adequate remedy at law or other effective means

of enforcing his right to family relationships under the First Amendment other than by

seeking declaratory and injunctive relief from the Court.

311.   As a result of Defendants' unlawful conduct, Mr. Abdulmutallab has

suffered and will continue to suffer emotional distress, psychological injury, and

destruction of family ties.

## FIFTH CLAIM FOR RELIEF
### Violation of the Fifth Amendment – Denial of Substantive Due Process
### (against Defendants Sessions and John Does 1-20)

312.   Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of

this Complaint as if set forth fully herein.

313.   Mr. Abdulmutallab brings this claim against Defendants Sessions and John

Does 1-20.

314.   By prohibiting Mr. Abdulmutallab from communicating with all but a small

group of narrowly defined immediate family members through the imposition and

renewals of the SAMs, Defendants Sessions and John Does, acting under color of law

and their authority as federal officers, are infringing upon Mr. Abdulmutallab's right to

family integrity, and this infringement is not reasonably related to any legitimate

penological interest, in violation of the Fifth Amendment to the United States

Constitution.

315.   Mr. Abdulmutallab has no adequate remedy at law or other effective means

of enforcing his Fifth Amendment rights to substantive due process other than by seeking

declaratory and injunctive relief from the Court.

316.   As a result of Defendants' unlawful conduct, Mr. Abdulmutallab is

suffering psychological injury, emotional distress, and destruction of his familial

relationships.

**SIXTH CLAIM FOR RELIEF**
**Violation of the First Amendment – Retaliation Against Mr. Abdulmutallab for**
**Engaging in Protected First-Amendment Activity**
**(Against Defendant BOP)**

317.   Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of

this Complaint as if set forth fully herein.

318.   Mr. Abdulmutallab brings this claim against Defendant BOP.

319.   The First Amendment to the United States Constitution protects the right to

petition the government for redress of grievances, including the right to hunger strike in

protest of unconstitutional conditions of confinement.

320.   It is a violation of the First Amendment to the United States Constitution

for government officials to retaliate against an individual for engaging in an activity

protected by the First Amendment.

321.   Defendant BOP has retaliated against Mr. Abdulmutallab for hunger

striking, which is an activity protected by the First Amendment.

322.   Following Mr. Abdulmutallab's hunger strikes in August of 2012 and

October 2012, Defendant BOP officials retaliated against him by confining him to the

Special Housing Unit of ADX and Range 13, without explanation or legitimate

penological justification.

323.    Imposition of these extreme conditions of confinement, including placement in the Special Housing Unit at ADX, is a serious deprivation that would deter a person of ordinary firmness from exercising his right to hunger strike.

324.    The timing of the imposition of these extreme conditions of confinement illustrates that Defendant BOP has retaliated against and punished Mr. Abdulmutallab for exercising his First-Amendment rights.

325.    Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his right to be free from retaliation for exercising his First-Amendment rights, other than by seeking declaratory and injunctive relief from the Court.

326.    As a result of Defendants' unlawful conduct, Mr. Abdulmutallab has suffered and will continue to suffer emotional distress and psychological injury.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment – Denial of Right to Refuse Medical Treatment**
**(Against Defendant BOP)**

327.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

328.    Mr. Abdulmutallab brings this claim against Defendant BOP.

329.    The liberty interest guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution protects an individual's deeply personal decision to reject medical treatment, including the artificial delivery of food and water.

330.    As a competent individual, Mr. Abdulmutallab has the right to refuse

medical treatment, including the artificial delivery of food and water.

331.    Defendant BOP's force-feeding nutrients into Mr. Abdulmutallab's

stomach against his will constitutes a substantial interference with his liberty and a

violation of his constitutional rights to privacy and bodily integrity.

332.    Mr. Abdulmutallab has no adequate remedy at law or other effective means

of enforcing his right to refuse medical treatment under the Fifth Amendment other than

by seeking declaratory and injunctive relief from the Court.

333.    As a result of Defendants' unlawful conduct, Mr. Abdulmutallab has

suffered and will continue to suffer emotional distress and psychological injury.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb (RFRA) – Denial of Group Prayer
### (Against Defendant BOP)

334.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of

this Complaint as if set forth fully herein.

335.    Mr. Abdulmutallab brings this claim against Defendant BOP.

336.    Defendant BOP is an agency of the federal government and therefore falls

within the definition of "government" set forth in 42 U.S.C. § 2000bb-2(1).

337.    As a devout Muslim, Mr. Abdulmutallab is obligated to perform prayer five

times daily and participate in Jum'ah services.

338.   Mr. Abdulmutallab sincerely believes he will receive punishment from Allah should he not participate in group prayer and Jum'ah.

339.   Defendant BOP substantially burdens Mr. Abdulmutallab's practice of congregational prayer by prohibiting him and other Muslim inmates in H-Unit from engaging in congregational prayers.

340.   Defendant BOP's policies prohibiting congregational prayer within H-Unit at ADX are the proximate cause of the deprivation of Mr. Abdulmutallab's rights under RFRA.

341.   Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his right under RFRA to engage in daily group prayers other than by seeking declaratory and injunctive relief from the Court.

342.   As a result of Defendant BOP's policies prohibiting congregational prayer in H-Unit during the more than five years that Mr. Abdulmutallab has been incarcerated there, Mr. Abdulmutallab has suffered harm and remains at risk of suffering harm into the future.

**NINTH CLAIM FOR RELIEF**
**Violation of RFRA – Failure to Provide Meaningful Access to an Imam**
**(Against Defendant BOP)**

343.   Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

344.   Mr. Abdulmutallab brings this claim against Defendant BOP.

345.    Defendant BOP is an agency of the federal government and therefore falls within the definition of "government" set forth in 42 U.S.C. § 2000bb-2(1).

346.    As a devout Muslim, Mr. Abdulmutallab sincerely believes he is required to consult with leaders of his religion and develop a more personal relationship with Allah through regular prayers and consultation with an imam.

347.    Defendant BOP substantially burdens Mr. Abdulmutallab's sincerely held religious belief by refusing to allow any access to an imam.

348.    Defendant BOP's failure to provide regular access to an imam is the proximate cause of the deprivation of Mr. Abdulmutallab's rights under RFRA.

349.    Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his right under RFRA to regularly meet with an imam other than by seeking declaratory and injunctive relief from the Court.

350.    As a result of Defendant BOP's failure to provide Mr. Abdulmutallab with regular access to an imam for several years, Mr. Abdulmutallab has suffered harm and remains at risk of suffering harm into the future.

## TENTH CLAIM FOR RELIEF
### Violation of RFRA – Denial of a Halal Diet
### (Against Defendant BOP)

351.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

352.    Mr. Abdulmutallab brings this claim against Defendant BOP.

353.    Defendant BOP is an agency of the federal government and therefore falls within the definition of "government" set forth in 42 U.S.C. § 2000bb-2(1).

354.    As a devout Muslim, Mr. Abdulmutallab is required to consume halal foods that meet guidelines established by Islamic law.

355.    Defendants have refused for years to provide Mr. Abdulmutallab with meals that comply with his religious dietary requirements.  After Mr. Abdulmutallab repeatedly told BOP Trust Fund and Religious Services staff that both the Food Service meals and commissary meals violated his religious beliefs, Defendant BOP told Mr. Abdulmutallab it is not required to ensure his access to halal meals with meat.  Defendant BOP officials have not worked to provide Mr. Abdulmutallab access to halal meals with meat.  This refusal substantially burdens Mr. Abdulmutallab's right to exercise his sincerely held religious belief.

356.    Defendant BOP's failure to provide a halal diet is the proximate cause of the deprivation of Mr. Abdulmutallab's rights under RFRA.

357.    Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his right under RFRA to a halal diet other than by seeking declaratory and injunctive relief from the Court.

358.    As a result of Defendant BOP's failure to provide a halal diet for several years, Mr. Abdulmutallab has suffered harm and remains at risk of suffering harm into the future.

## ELEVENTH CLAIM FOR RELIEF
### Violation of RFRA – Responding to Sincerely Held Religious Belief in Need for Hunger Striking by Force-Feeding
### (Against Defendant BOP)

359.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

360.    Mr. Abdulmutallab brings this claim against Defendant BOP.

361.    Defendant BOP is an agency of the federal government and therefore falls within the definition of "government" set forth in 42 U.S.C. § 2000bb-2(1).

362.    As a devout Muslim, Mr. Abdulmutallab believes he must follow the religious tenets described *supra*.  Given Defendants' isolation of Mr. Abdulmutallab in solitary confinement under SAMs, and the years-long violations of his religious rights and harassment of him surrounding his religion and religious practices during his incarceration, Mr. Abdulmutallab's conduct in engaging in passive, nonviolent hunger striking (to protest the inhumane conditions of his confinement and the ongoing violations of his religious rights) itself became a religious practice conducted in accordance with his sincerely held religious beliefs.

363.    Defendant BOP has substantially burdened Mr. Abdulmutallab's religious practices and sincerely held religious beliefs by responding to his passive, nonviolent hunger striking by brutally and violently force-feeding him, causing him physical pain and injury.

364.   Defendant BOP's use of force-feeding in response to Mr. Abdulmutallab's hunger-striking imposes a substantial burden on his exercise of his religion because hunger-striking is the only way Mr. Abdulmutallab can show Allah that he does not tolerate and accept Defendants and other inmates continually insulting his religion.

365.   Defendant BOP's policy and practices regarding force-feeding hunger-striking prisoners are the proximate cause of the deprivation of Mr. Abdulmutallab's rights under RFRA.

366.   As a result of Defendant BOP's policies and practices regarding force-feeding hunger-striking prisoners, Mr. Abdulmutallab has suffered harm and remains at risk of suffering harm into the future.

367.   Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his right under RFRA not to be force fed other than by seeking declaratory and injunctive relief from the Court.

368.   As a result of Defendant BOP's unlawful conduct in responding to Mr. Abdulmutallab's passive, nonviolent protest of his inhumane conditions of confinement and violations of his religious rights by brutally and violently force-feeding him, Mr. Abdulmutallab has been physically injured and continues to face an unconstitutional risk of physical injury, and he has suffered psychological pain, injury, and emotional distress and continues to face an unconstitutional risk of psychological pain, injury, and emotional distress.

## TWELFTH CLAIM FOR RELIEF
### Violation of RFRA – Force-Feeding Non-Halal Nutritional Supplement
### (Against Defendant BOP)

369.    Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

370.    Mr. Abdulmutallab brings this claim against Defendant BOP.

371.    Defendant BOP is an agency of the federal government and therefore falls within the definition of "government" set forth in 42 U.S.C. § 2000bb-2(1).

372.    As a devout Muslim, Mr. Abdulmutallab sincerely believes he is required to consume only halal foods that meet guidelines established by Islamic law.

373.    Defendant BOP has repeatedly forced Mr. Abdulmutallab into a six-point restraint chair, strapped him down, and made him involuntary ingest non-halal (or "haram") nutritional supplement.  This completely involuntary force-feeding of haram substances substantially burdens Mr. Abdulmutallab's sincerely held religious beliefs.

374.    Defendant BOP's policy and practice of force-feeding hunger-striking Muslim inmates with haram substances is the proximate cause of the deprivation of Mr. Abdulmutallab's rights under RFRA.

375.    Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his right under RFRA not to be force fed with haram substances other than by seeking declaratory and injunctive relief from the Court.

376.     As a result of Defendant BOP's policy and practice of force-feeding him with haram substances, Mr. Abdulmutallab has suffered harm and remains at risk of suffering harm into the future.

### THIRTEENTH CLAIM FOR RELIEF
### Violation of the Eighth Amendment – Force-Feeding as Excessive Force
### (Against Defendant BOP)

377.     Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

378.     Mr. Abdulmutallab brings this claim against Defendant BOP.

379.     Defendant BOP maliciously and sadistically use excessive force on Mr. Abdulmutallab by brutally and violently force-feeding him, causing him pain and injury.

380.     Defendant BOP uses brutal and violent force-feeding on Mr. Abdulmutallab for the purpose of retaliating against and punishing Mr. Abdulmutallab for exercising his legal rights by passively and nonviolently hunger striking to protest the inhumane conditions of his confinement and ongoing violations of his religious rights. Defendant BOP's purpose in force-feeding Mr. Abdulmutallab at all and in the brutal and violent manner used is also for the purpose of deterring him and other ADX prisoners— including other ADX prisoners under SAMs—from protesting and drawing attention to the inhumane conditions of their confinement and violations of their religious rights by engaging in passive, nonviolent hunger striking.

381.   Defendant BOP has and will continue to use excessive force by force-feeding Mr. Abdulmutallab, thereby subjecting him to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

382.   Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his Eighth-Amendment rights other than by seeking declaratory and injunctive relief from the Court.

383.   As a result of Defendant BOP's unlawful conduct in responding to Mr. Abdulmutallab's passive, nonviolent protest of his inhumane conditions of confinement and violations of his religious rights by brutally and violently force-feeding him, Mr. Abdulmutallab has been physically injured and continues to face an unconstitutional risk of physical injury, and he has suffered psychological pain, injury, and emotional distress and continues to face an unconstitutional risk of psychological pain, injury, and emotional distress.

**FOURTEENTH CLAIM FOR RELIEF**
**Violation of the Eighth Amendment—Cruel and Unusual Punishment Arising From the Totality of Circumstances, Including: Long-term, Indefinite Solitary Confinement; SAMs; Violations of Religious Rights; and Force-Feeding (Against all Defendants)**

384.   Mr. Abdulmutallab incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

385.   Mr. Abdulmutallab brings this claim against all Defendants.

386.    Defendants willfully and maliciously subject Mr. Abdulmutallab to excessive, cruel, inhuman, and degrading conditions of confinement, including prolonged and complete denial of any opportunity for physical contact with their loved ones, excessive restriction of other means of communication with family members and members of the community; extended detention in a unit segregated from other inmates, without legitimate penological purpose; and restrictions on his ability to meaningfully practice his sincerely held religious beliefs.

387.    If he were not under SAMs, Mr. Abdulmutallab, like the overwhelming majority of other federal prisoners in the United States, would be able to draw public attention and scrutiny of the unconstitutional and inhumane conditions of his confinement by communicating openly about such problems with members of the public, including human-rights advocates and entities as well as members of the media.

388.    Because of overly restrictive nature of the SAMs, however, Mr. Abdulmutallab has had to resort to hunger striking in order to attempt to challenge the unconstitutional and inhumane conditions of his confinement in an effective manner.

389.    Defendants use brutal force-feeding for the purpose of retaliating against and punishing Mr. Abdulmutallab for exercising his constitutional and legal rights.

390.    Defendants also use brutal force-feeding for the purpose of deterring Mr. Abdulmutallab from exercising his constitutional and legal rights in the future.

391.    By incarcerating Mr. Abdulmutallab in indefinite, long-term solitary confinement under SAMS; subjecting him to inhumane conditions of confinement; violating his religious rights; and then force-feeding him when he passively and nonviolently protests, Defendants are imposing punishment on Mr. Abdulmutallab that violates the evolving standards of decency that are the hallmark of a maturing society, and that is cruel and unusual in violation of the Eighth Amendment to the United States Constitution.

392.    By incarcerating Mr. Abdulmutallab in indefinite, long-term solitary confinement under SAMS; subjecting him to inhumane conditions of confinement; violating his religious rights; and then force-feeding him when he passively and nonviolently protests, Defendants are denying Mr. Abdulmutallab the minimal civilized measure of life's necessities in violation of the Eighth Amendment to the United States Constitution.

393.    These distinct constitutional violations have a mutually reinforcing effect of depriving Mr. Abdulmutallab of social interaction—a basic human need—through prolonged solitary confinement and restrictive communication measures coupled with depriving Mr. Abdulmutallab of the opportunity to remediate his harsh conditions of confinement with either religious practice or peaceful protest.

394.    Mr. Abdulmutallab has no adequate remedy at law or other effective means of enforcing his Eighth-Amendment right to be free from cruel and unusual punishment other than by seeking declaratory and injunctive relief from the Court.

395.    As a result of Defendants' unlawful conduct, Mr. Abdulmutallab is suffering psychological pain and harm and unnecessary punishment and will continue to suffer such harms in the future.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Mr. Abdulmutallab respectively requests that this Court enter judgment in his favor and against the Defendants, and grant him the following relief:

a)      A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right to procedural protections under the Due Process Clause of the Fifth Amendment;

b)      A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's rights under the Free-Speech Clause of the First Amendment;

c)      A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right to Free Association guaranteed by the First Amendment;

d)      A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right to Familial Association guaranteed by the First Amendment;

e)       A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right to substantive due process under the Due Process Clause of the Fifth Amendment;

f)       A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right to engage in First Amendment protected activity without retaliation;

g)       A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right to refuse medical treatment under the Fifth Amendment;

h)       A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's rights under the Religious Freedom Restoration Act (RFRA);

i)       A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right under the Eighth Amendment to be free from excessive force;

j)       A declaration that the acts and omissions described herein are in violation of Mr. Abdulmutallab's right under the Eighth Amendment to be free from cruel and unusual punishments;

k)       A permanent injunction ordering Defendant Sessions to remove the SAMs from Mr. Abdulmutallab and prohibiting Defendant Sessions or future Attorneys General from re-imposing SAMs on Mr. Abdulmutallab;

l)      A permanent injunction ordering Defendant BOP to remove Mr.

Abdulmutallab from solitary confinement (a/k/a "restrictive housing");

m)     A permanent injunction prohibiting Defendant BOP from retaliating against

Mr. Abdulmutallab for engaging in First Amendment protected activity;

n)      A permanent injunction prohibiting Defendant BOP from force-feeding Mr.

Abdulmutallab;

o)      A permanent injunction ordering Defendant BOP to allow and/or provide

Mr. Abdulmutallab, at any and all BOP facilities where he is placed:

i.      the ability to engage in daily congregational group prayers during

the times that he is otherwise allowed out of his cell;

ii.     meaningful, regular access to an imam;

iii.    a nutritionally adequate, halal-certified diet with halal-certified meat

products that fully conforms to his religious beliefs; and

iv.     information regarding the source(s) of halal certification of BOP

inmate meals so that he may ensure the meals conform to his religious beliefs;

p)      Attorney's fees and the costs associated with this action as allowed by law;

and

q)      Any further relief that this Court deems just and proper, and any other relief

as allowed by law.

Dated this 14th day of April, 2018.

JOHNSON & KLEIN, PLLC

s/Gail K. Johnson
**Gail K. Johnson**
Aurora L. Randolph
1470 Walnut Street, Suite 101
Boulder, CO  80302
(303) 444-1885
(866) 340-8286 (fax)
gjohnson@johnsonklein.com
arandolph@johnsonklein.com

ATTORNEYS FOR PLAINTIFF
UMAR FAROUK ABDULMUTALLAB

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of April 2018, I electronically filed the foregoing

**FIRST AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record, including the following:

David Z. Moskowitz
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO  80202
david.moskowitz@usdoj.gov


s/ Gail K. Johnson
*Gail K. Johnson*