**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02493-RM-KMT

UMAR FAROUK ABDULMUTALLAB,

     Plaintiff,

v.

JEFFERSON SESSIONS, Attorney General of the United States, in his official capacity,
FEDERAL BUREAU OF PRISONS, and
JOHN DOES 1 THROUGH 20, in their official capacities,

     Defendants.

---

## MOTION TO DISMISS AMENDED COMPLAINT [76]

---

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants Attorney General Jefferson Sessions, in his official capacity, and the Bureau of Prisons ("Defendants") move to dismiss Claims 1-7 and 11-14 of the amended complaint. Defendants certify that, pursuant to Judge Moore's Practice Standards, the parties conferred via email on January 30-31, 2018 and May 8, 2018 regarding the grounds for this motion. Plaintiff opposes the motion.

### INTRODUCTION

Plaintiff Umar Farouk Abdulmutallab is an unrepentant terrorist, who attempted to blow up a commercial airliner and kill 289 people on board. He testified in court that he believes his participation in jihad against the United States is among the most virtuous deeds and that he is obligated and proud to kill in the name of God. He brings this civil action, challenging his conditions of confinement at the United States Penitentiary – Administrative Maximum, in Florence, Colorado ("ADX"). As detailed in this motion and an accompanying motion for partial

summary judgment, all 14 of these claims are subject to dismissal for lack of jurisdiction, failure to exhaust administrative remedies, and/or failure to state a claim.

In Claim 1, Plaintiff alleges his transfer to the ADX violates due process, but the Tenth Circuit has ruled that there is no protected liberty interest in transfer to the ADX. In Claims 2-5, Plaintiff challenges his Special Administrative Measures ("SAMs") and argues that restrictions on his communications violate the law. But the Tenth Circuit and this Court have repeatedly upheld such restrictions in cases, like this one, where there is a rational relationship between the restrictions and the inmate's offense as well as his statements declaring an obligation to participate in jihad. In Claims 6-7 and 11-13, Plaintiff challenges the BOP's actions related to his hunger strikes in 2012 and 2015, seeking to bar the BOP from force-feeding him during any hypothetical future hunger strike. Plaintiff lacks standing to bring this claim for prospective relief based on years-old allegations. Moreover, as federal courts have repeatedly held, force-feeding a hunger-striking inmate is justified based on the government's compelling interests in preserving inmate health and maintaining order and discipline. Finally, in Claim 14, Plaintiff challenges that his overall conditions of confinement violate the Eighth Amendment, but the Supreme Court and Tenth Circuit have rejected such overall conditions of confinement claims. For these reasons, as detailed further below, the Court should dismiss Claims 1-7 and 11-14.[1]

## FACTUAL BACKGROUND

Plaintiff Umar Farouk Abdulmutallab is a convicted terrorist, often referred to in the media as the "Underwear Bomber." He is serving four terms of life imprisonment plus 50 years

---

[1] Defendants have separately moved for partial summary judgment for failure to exhaust administrative remedies with regard to Claims 1, 6, 8-10, and 12, as well as with respect to portions of Claims 2-5, 7, 11, 13, 14 and the allegations in paragraph 147.

for his convictions for attempting to use a weapon of mass destruction on a commercial airliner that landed in Detroit, Michigan, and attempting to murder 289 people on board. Dkt. 76 ¶ 1. As Plaintiff testified under oath at his plea colloquy, "in fulfillment of a religious obligation, I decided to participate in jihad against the United States."[2] Ex. 1 at 25:25-26:2, *United States v. Abdulmutallab*, No. 10-cr-200005 (E.D. Mich.) (Dkt. 114, Plea Transcript). Plaintiff testified that "[t]he Koran obliges every able Muslim to participate in jihad and fight in the way of Allah, those who fight you, and kill them where you find them." *Id.* at 26:2-4. Plaintiff further testified that "[p]articipation in jihad against the United States is considered among the most virtuous deeds in Islam and is highly encouraged in the Koran." *Id.* at 27:1-3. Plaintiff admitted that he attempted to use a weapon of mass destruction—which he called "a blessed weapon"—in order to destroy a commercial airliner and kill those on board. *Id.* at 26:15-20, 25:18-25. He testified that "the U.S. should await a great calamity that will befall them through the hands of the mujahideen soon by God's willing permission." *Id.* at 29:9-11.

During his sentencing, when the government presented video evidence demonstrating the destructive nature of his explosive device, Plaintiff repeatedly interrupted with chants of "Allahu Akbar"—"God is great." Ex. 2 at 42:10-43:2, *United States v. Abdulmutallab*, No. 10-cr-200005 (E.D. Mich.) (Dkt. 139, Sentencing Transcript). In his statement to the court, Plaintiff praised Osama Bin Laden and Anwar Al-Awlaki as "rightly guided" and proclaimed that they are "alive

---

[2]  On a motion to dismiss, a court may consider documents incorporated by reference, documents referred to in the complaint that are central to the claims, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Publicly filed court records, including court transcripts, are subject to judicial notice. *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979); *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007); *Trusdale v. Bell*, 85 F. App'x 691, 693 (10th Cir. 2003).

and shall be victorious by God's grace." *Id.* at 39:22-25. "The mujahedeen are proud to kill in the name of God, and that is exactly what God told us to do in the Koran." *Id.* at 40:9-10. As the district court summed up following Plaintiffs' various statements, "by his own words, defendant has shown that he continues to desire to harm the United States and its citizens, and that he views it as his religious obligation to do so." *Id.* at 54:18-20. The court stated that Plaintiff "poses a significant, ongoing threat to the safety of American citizens everywhere." *Id.* at 54:8-10.

Plaintiff is a federal prisoner who has been housed at the ADX since 2012. Dkt. 76 ¶ 4. In March 2012, the Attorney General imposed Special Administrative Measures ("SAMs") against Plaintiff pursuant to 28 C.F.R. § 501.3, after finding "there is a substantial risk that [Plaintiff's] communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."[3] Ex. 3, March 2012 SAMs at 3; *see also* Dkt. 76 ¶¶ 7, 119-20. The SAMs list numerous reasons for the restrictions, including that Plaintiff engaged in a martyrdom mission to destroy a passenger plane and kill those on board, an action for which he has yet to show any remorse; Plaintiff recorded a martyrdom video released by al Qaeda in which he exhorted others to the call of jihad; Plaintiff desires to harm the United States; Plaintiff made statements during his criminal proceeding and to government officials that he is proud to kill in the name of God and has a religious obligation to engage in jihad against the United States; there is a substantial risk that he will attempt to radicalize others, including fellow inmates, if his communications are

---

[3] The Court may consider Plaintiff's SAMs on a motion to dismiss because they are referenced in the complaint, are central to the claims, and the authenticity of the documents is not in dispute. *Gee*, 627 F.3d at 1186; *Al-Owhali v. Mukasey*, No. 07-cv-02214-LTB-BNB, 2010 WL 5651033, at *10 n.3 (D. Colo. June 17, 2010), *adopted in relevant part*, 2011 WL 288523 (D. Colo. Jan. 27, 2011), *aff'd*, 687 F.3d 1236 (10th Cir. 2012).

not appropriately restricted; he remains loyal to al Qaeda; there is a substantial risk that, if given the opportunity, he will seek to facilitate additional terrorist acts; and he has a proclivity for violence. Ex. 3 at 2; Ex. 4, March 2018 SAMs Renewal at 2-3. The SAMs explain that when Plaintiff "was asked if [he] still had an obligation to commit jihad in light of the fact that his martyrdom mission failed, [he] replied that the obligation to jihad still existed." Ex. 3 at 2; Ex. 4 at 2. The initial SAMs expired in March 2013 and have been renewed on an annual basis, with the latest renewal in March 2018. Dkt. 76 ¶ 123; Ex. 4. During that renewal, it was found that Plaintiff "has never expressed any regret or remorse for [his] conduct, but instead view[s] [his] crimes as compelled by religious duty" and "believes that [he] and others have a continuing obligation to carry out such crimes." Ex. 4 at 3.

The SAMs allow Plaintiff to communicate through writing, calls, and personal visits with his immediate family, his list of authorized contacts (including his step-sisters, uncle, and step-mother), and his attorneys and related legal providers. Ex. 4 at ¶¶ 1.c, 2, 3. Plaintiff is allowed to communicate and visit with consular representatives, *id.* ¶ 11, as well as to communicate with the U.S. courts, federal judges, U.S. Attorney's Offices, members of the U.S. Congress, the Bureau of Prisons, and federal law enforcement entities, *id.* ¶ 3.g. Plaintiff is permitted to communicate with non-terrorist inmates during predesignated times. *Id.* ¶ 1.c. Plaintiff is otherwise prohibited from communicating with other persons, but he may request additional approved contacts, who are evaluated "on a case-by-case basis." *Id.* at 9 n.7. Plaintiff may access mass communications, including television, newspapers, books, and other publications so long as they do not facilitate criminal activity, harm national security, or harm the security, good order, or discipline of the institution. *Id.* ¶ 8-9. Plaintiff is not permitted to communicate with the media. *Id.* ¶ 4. The

Department of Justice found that such restrictions are reasonably necessary to prevent Plaintiff from committing, soliciting, or conspiring to engage in additional criminal activity, to prevent him from receiving and acting upon critically timed messages, and to prevent him from advocating or inciting terrorist, criminal, and/or violent offenses. *Id.* at 16-17.

Plaintiff brings this civil action with 14 claims challenging his conditions of confinement. In Count 1, Plaintiff alleges that his transfer to the ADX in 2012 violated due process. Dkt. 76 ¶¶ 284-88. In Counts 2-5, Plaintiff alleges his SAMs violate the First and Fifth Amendments. *Id.* ¶¶ 289-316. In Counts 6-7 and 11-13, Plaintiff alleges BOP's actions related to his hunger strikes in 2012 and 2015 violated the First, Fifth, and Eighth Amendments, as well as the Religious Freedom Restoration Act ("RFRA"). *Id.* ¶¶ 317-33, 359-83. In Counts 8-10, Plaintiff alleges that the BOP violated RFRA by denying group prayer with other inmates, regular access to an imam, and a halal diet. *Id.* ¶¶ 334-58. In Count 14, Plaintiff alleges that the overall conditions of his confinement constitute cruel and unusual punishment. *Id.* ¶¶ 384-95. Plaintiff seeks purely prospective declaratory and injunctive relief for the alleged violations. *Id.* Prayer for Relief.

## STANDARDS OF REVIEW

### A.   Federal Rule of Civil Procedure 12(b)(1)

The plaintiff bears the burden of establishing the Court's subject matter jurisdiction. *Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005). Federal Rule of Civil Procedure 12(b)(1) serves as the appropriate vehicle to challenge subject matter jurisdiction in a particular matter. *See, e.g.*, *Satterfield v. Malloy*, 700 F.3d 1231, 1234 (10th Cir. 2012). When considering a Rule 12(b)(1) motion, a court may review evidence outside of the complaint. *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1255 (10th Cir. 2001).

**B.** **Federal Rule of Civil Procedure 12(b)(6)**

In adjudicating a motion to dismiss pursuant to Rule 12(b)(6), a court must determine whether a complaint fails to state a claim upon which relief can be granted. Although a court must accept as true all well-pleaded factual allegations in a complaint, it need not credit allegations that are merely conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 678. Where the well-pleaded facts are "merely consistent with a defendant's liability" or "mere possibility of misconduct," the complaint fails to state a claim for relief that is plausible on its face, and the complaint must be dismissed. *Id.* 678-79.

## ARGUMENT

**I.** **The Tenth Circuit has repeatedly held that there is no protected liberty interest in a transfer to the ADX (Claim 1).**

In Claim 1, Plaintiff alleges that his transfer to the ADX violated his procedural due process rights because he claims that he was not provided meaningful notice and or meaningful opportunity to be heard. Dkt. 76 ¶¶ 284-88. This claim has been repeatedly rejected because, as the Tenth Circuit has held, there is no protected liberty interest in the transfer to the ADX. *Rezaq v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012); *Gowadia v. Stearns*, 596 F. App'x 667, 673-74 (10th Cir. 2014); *Allmon v. Wiley*, 2011 WL 4501941, at *15 (D. Colo. Aug. 25, 2011), *adopted*, 2011 WL 4501937 (D. Colo. Sept. 27, 2011), *aff'd*, 483 F. App'x 430 (10th Cir. 2012).

An inmate has a "heavy burden" to establish that a prison restriction violates his due process rights. *Shaw v. Murphy*, 532 U.S. 223, 226 (2001). A prisoner must show two elements:

(1) he was deprived of a protected liberty or property interest; and, if so, (2) the procedures followed were constitutionally insufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Here, Plaintiff has failed to allege facts showing either element of a due process violation.[4]

### A. Element not met: Deprivation of a protected liberty interest.

Prisoners retain "only a narrow range of protected liberty interests." *Abbott v. McCotter*, 13 F.3d 1439, 1442 (10th Cir. 1994). "[T]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1982), *overruled in part on other grounds*, *Sandin v. Conner*, 515 U.S. 472 (1995). "[A] deprivation occasioned by prison conditions or a prison regulation does not reach protected liberty interest status and require procedural due process protection unless it imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006). The Tenth Circuit has developed a four-factor analysis for evaluating this question: (1) whether the conditions relate to and further the government's legitimate interests in prison safety and national security; (2) whether the conditions are extreme; (3) whether the conditions increase the duration of the inmate's confinement; and (4) whether the length of time the inmate will be subject to the conditions is indeterminate. *Rezaq*, 677 F.3d at 1012-13; *see also Estate of DiMarco v. Wyoming Dep't of Corrs.*, 473 F.3d 1334, 1342-44 (10th

---

[4] In addition, the relief Plaintiff seeks is unavailable. He seeks an injunction ordering the BOP to remove Plaintiff from the ADX. Dkt. 76 ¶ 5, Prayer for Relief. This remedy is improper for numerous reasons, not the least of which is that the proper remedy for a procedural due process violation is the process that is due, not the substantive grant of relief. *See, e.g.*, *Codd v. Velger*, 429 U.S. 624, 627 (1977); *Davis v. Holder*, No. 12-cv-02122-REB-KMT, 2014 WL 1713429, at *9 (D. Colo. Apr. 23, 2014) ("[I]n the procedural due process context, the appropriate remedy is not damages, but 'procedural protections as the particular situation demands.'").

Cir. 2007). Applying these four factors, the Tenth Circuit and this Court have repeatedly held that the conditions of confinement at the ADX do not implicate a protected liberty interest.

Under the first factor, there is a reasonable connection between Plaintiff's incarceration at the ADX and the government's "uniquely federal penological interest in addressing national security risks by segregating inmates with ties to terrorist organizations." *Rezaq*, 677 F.3d at 1014. As the Tenth Circuit has held, there need only be a "reasonable relationship," and the BOP may properly consider the underlying nature of Plaintiff's crime in designating him to the ADX. *Gowadia*, 596 F. App'x at 673. Here, Plaintiff was convicted of a terrorist act in attempting to blow up a passenger plane with a weapon of mass destruction and murder 289 people on board. He testified that participating in jihad against the United States is among the most virtuous deeds, that he has an obligation and is proud to kill in the name of God, and that he remains loyal to al Qaeda leaders. Ex. 1 at 26-27; Ex. 2 at 39-40; Ex. 3, 4. This more than establishes a reasonable relationship between Plaintiff's crimes, his statements regarding an obligation to engage in jihad and desire to harm the United States, and his placement at the ADX.

Under the second factor, the Tenth Circuit "has already established that the conditions at ADX are not atypically 'extreme,'" including those conditions in the unit where Plaintiff is housed. *Gowadia*, 596 F. App'x at 673; *Rezaq*, 677 F.3d at 1015; *Allmon*, 2011 WL 4501941, at *15 ("[C]onditions of confinement in H Unit do not differ in any meaningful way from those in other ADX units and do not implicate a liberty interest."); *Ayyad v. Holder*, No. 05-cv-02342-WYD-MJW, 2014 WL 4747451, at *34-35 (D. Colo. Sept. 24, 2014) (concluding that conditions in H Unit are not extreme, are common to many high-security prisons, and that convicted terrorists "are the very types of inmate who are routinely subject to nonpunitive restrictive

confinement and who can reasonably expect to find themselves in such conditions"). Plaintiff can write and receive correspondence, receive visitors, make telephone calls, talk with others in the prison, access books and other publications, and obtain information by means of the mass media. "The conditions at ADX are comparable to those routinely imposed in the administrative segregation setting," and are thus neither atypical nor extreme. *Rezaq*, 677 F.3d at 1015.

Under the third factor, Plaintiff's placement at the ADX does not increase the duration of his confinement. *Rezaq*, 677 F.3d at 1016; *Gowadia*, 596 F. App'x at 673. Plaintiff is already serving four life sentences plus 50 years for his crimes.

Under the fourth factor, Plaintiff's placement at the ADX, as a matter of law, is not considered "indeterminate." Plaintiff's allegation that there is no finite length to his placement is irrelevant because duration must be "considered in tandem with indeterminacy." *Rezaq*, 677 F.3d at 1016. The Tenth Circuit holds that duration of conditions becomes atypical and significant only when an inmate does not receive "regular reevaluations" or periodic reviews of the conditions. *Id.* (holding no indeterminacy after 13 years at the ADX, even when those conditions are not of a "predictably finite" length, because of regular reevaluations); *see also Gambina v. Fed. Bureau of Prisons*, No. 10-cv-02376-MSK-KLM, 2013 WL 791428, *3 (D. Colo. Mar. 4, 2013) (holding inmate's confinement in ADX since 1998 was not indeterminate because of regular, periodic reviews). Plaintiff receives the same twice-yearly Program Reviews as in *Rezaq* and *Gowadia*, plus he receives annual reviews to assess whether the SAMs should be renewed.[5]

---

[5] The Special Security Unit Supplement describes the periodic Program Reviews, which occur at least every six months. Ex 5, Inst. Supp. FLM 5321.07(3)I, Special Security Unit (H-Unit), § IV. The Supplement further describes the annual SAMs review process. During that process, the inmate may submit written comments. *Id.* § III.B. Further, approximately 90 days before the SAM expires, BOP and FBI personnel meet with the inmate to discuss "information concerning

*See* Ex. 3, 4; Ex. 5 (detailing periodic Program Reviews); Dkt. 76 ¶ 123; 28 C.F.R. § 501.3(c).

Under Tenth Circuit precedent, this confinement is not considered indeterminate.

In sum, as the Tenth Circuit and this Court have previously held for inmates in similar circumstances, all four factors weigh in favor of no protected liberty interest. Plaintiff's procedural due process claim should therefore be dismissed.

### B.    Element not met: Lack of constitutionally sufficient process.

Because Plaintiff has no protected liberty interest in his transfer to the ADX, his procedural due process claim fails. The Court therefore need not reach the second element, whether the process afforded was constitutionally sufficient. But even if the Court examines this element, the process Plaintiff received satisfies any constitutional requirement in this context.

Once incarcerated, inmates are not entitled to full process, such as an adversary hearing or the right to present witnesses. The Supreme Court has explained that, "[w]here the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in *Greenholtz* [*v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1 (1979)] . . . and *Hewitt v. Helms*[, 459 U.S. 460 (1983)], . . . provide the appropriate model." *Wilkinson v. Austin*, 545 U.S. 209, 228-29 (2005). Under those procedures, *some* notice and opportunity to be heard

---

possible renewal [or] modification of the SAM," and "any other issues concerning the SAM." *Id.* The information provided at the meeting by the inmate, along with the inmate's written comments, are forwarded to the appropriate United States Attorney's Office, the FBI or other relevant law enforcement agency, and the Office of Enforcement Operations in the criminal division of the United States Department of Justice for review in determining whether the SAMs should be renewed and/or modified. *Id.*

The Court may take judicial notice of the institution supplement. *See Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010).

are constitutionally sufficient, even if significantly limited. *Hewitt*, 459 U.S. at 462, 464. Likewise, officials need only "engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* at 477 n.9.

Plaintiff acknowledges he received notice prior to the hearing on his ADX placement, and that he presented arguments at that hearing. Dkt. 76 ¶¶ 76, 79-84. While Plaintiff may disagree with the outcome, and may believe his arguments were not adequately taken into account, there is no dispute that Plaintiff had notice, was present at the hearing, and presented arguments. In addition, Plaintiff had the opportunity to file an Administrative Remedy regarding any perceived inadequacies with his hearing or placement at the ADX. 28 C.F.R. §§ 542.13-542.15. Finally, as described above, Plaintiff receives regular reevaluations both for his placement at the ADX and for his SAMs. Consequently, even if Plaintiff had a protected liberty interest, the BOP provided the "relaxed" procedures that more than satisfy due process in this particular context. *DiMarco*, 473 F.3d at 1344.

## II. The SAMs are reasonably related to protecting national security and therefore do not violate the Constitution (Claims 2-5).

In Claims 2-5, Plaintiffs alleges that his SAMs violate his First and Fifth Amendment rights by restricting his communications and association with other persons. Dkt. 76 ¶¶ 289-316. As a remedy, Plaintiff seeks a "permanent injunction ordering Defendant Sessions to remove the SAMs" and "prohibiting Defendant Sessions or future Attorneys General from re-imposing SAMs." *Id.* Prayer for Relief. As detailed below, the SAMs were imposed for legitimate penological reasons to protect national security and therefore do not violate the Constitution.

**A.     The SAMs do not violate the First Amendment (Claims 2-4).**

Plaintiff alleges in Claims 2-4 that the SAMs violate his First Amendment rights by restricting his communications and his associations. Plaintiff fails to state a claim because he fails to allege facts, taken as true, that show there is no rational connection between the SAMs restrictions and the government's penological interest in protecting national security.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court established a deferential standard for reviewing restrictions on prisoners' constitutional rights, holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This deferential standard reflects the principle that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948), *overruled on other grounds*, *McCleskey v. Zant*, 499 U.S. 467 (1991); *see also Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (recognizing that inmates retain only those First Amendment rights "not inconsistent with their status as prisoners or with the legitimate penological objectives").

Based on *Turner*, the Supreme Court has repeatedly held that First Amendment rights are appropriately curtailed in prison and that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); *see also Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125-26 (1977). *Turner* is satisfied if officials, in their judgment, believe that the restriction would advance the desired goal. *See Johnson v. California*, 543 U.S. 499, 513 (2005) (observing that *Turner* does not require proof a policy advanced the goal, but only that officials "might reasonably have thought" it would); *Beard v.*

*Banks*, 548 U.S. 521, 535 (2006) (upholding restriction even absent a showing that the restriction had "proven effective"). In conducting this analysis, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Id.*

In order to survive a motion to dismiss, a prisoner must account for the "core holding" of *Turner* and therefore has the burden to plead facts showing the *absence* of a rational connection between the challenged restriction and any legitimate penological interests. *Al-Owhali v. Holder*, 687 F.3d 1236, 1239 (10th Cir. 2012) (upholding dismissal of a First Amendment claim brought by a SAMs inmate). "Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison." *Gee*, 627 F.3d at 1186. Consequently, the complaint must show, through specific factual allegations, why the government's justifications do not have a rational connection to the challenged restrictions. *Id.* This generally requires a prisoner to "recite facts that might well be unnecessary in other contexts to surmount a motion to dismiss." *Al-Owhali*, 687 F.3d at 1240. It is plaintiff's "burden to demonstrate that there is no legitimate, rational basis" for the restrictions. *Id.* at 1241.

The government has a well-established legitimate penological interest in protecting national security. *Rezaq*, 677 F.3d at 1014 (discussing the "uniquely federal penological interest in addressing national security risks"). While prison administrators are generally entitled to substantial deference, *Overton*, 539 U.S. at 132, that deference is even greater in the realm of national security. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010); *see also*

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ("courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"); *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (judicial deference "pervades the area of national security"); *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007) (acknowledging "special deference" in matters relating to national security "even when constitutional rights are invoked"). "[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess." *Humanitarian Law*, 561 U.S. at 34. "In this context, conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government." *Id.* at 34-35. A court must defer to the government's predictive judgment in relation to national security because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment." *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988).

Based on this legitimate penological interest in protecting national security, the Tenth Circuit and this Court have repeatedly upheld SAMs restrictions nearly identical to the restrictions challenged here.[6] *See, e.g.*, *Gowadia*, 596 F. App'x at 673; *Al-Owhali*, 687 F.3d at 1241; *Nicholson v. Brennan*, No. 15-cv-01999-KLM, 2017 WL 4337896 (D. Colo. Sept. 28, 2017); *Salim v. Lynch*, No. 1:13-cv-03175-RM-CBS (D. Colo. Nov. 30, 2016) (Dkt. 95). As the Tenth Circuit concluded in *Gowadia*, there is "an obvious and reasonable relationship between

_____

[6] The SAMs restrictions here are similar to those restrictions in prior cases. *Compare* Ex. 3, 4; *with Nicholson v. Brennan*, No. 15-cv-01999-KLM (D. Colo.) (Dkt. 57-5); *Salim v. Lynch*, No. 13-cv-03175-RM-CBS (D. Colo.) (Dkt. 34-1); *Gowadia v. Stearns*, No. 13-cv-00077-KMT (D. Colo.) (Dkt. 43-2); *Al-Owhali v. Holder*, No. 07-cv-02214-LTB-BNB (D. Colo.) (Dkt. 51-1).

Gowadia's crimes and the measures the BOP implemented to restrict his communications." 596

F. App'x at 673. Similarly here, there is an "obvious and reasonable relationship" between

Plaintiff's crime, his statements under oath regarding his obligation to engage in jihad and desire

to harm the United States, his martyrdom video encouraging others to answer the call of jihad,

and the restrictions imposed in the SAMs.

Plaintiff is a terrorist who has testified that he has a religious obligation to engage in jihad

against the United States. He was convicted of attempting to use a weapon of mass destruction—

a "blessed weapon" in his words—to blow up a commercial airliner and kill 289 people on

board. Ex. 1. He testified that he believes jihad against the United States is among the most

virtuous deeds, that he is obliged to participate in jihad and proud to kill in the name of God, and

that the United States should await a great calamity that will soon befall them at the hands of the

mujahedeen. Ex. 1, 2. The district judge stated that "by his own words, defendant has shown that

he continues to desire to harm the United States and its citizens, and that he views it as his

religious obligation to do so" and that he "poses a significant, ongoing threat to the safety of

American citizens everywhere." Ex. 2 at 54:8-10, 54:18-20. The Attorney General found there is

a substantial risk that Plaintiff's communications or contacts with persons could result in death or

serious bodily injury to persons. This finding was based on numerous reasons, including his

crime; his martyrdom video released by al Qaeda where he exhorted others to engage in jihad;

and his own statements during his criminal proceedings and to government officials indicating

that he has an obligation to conduct jihad against the United States, a desire to harm the United

States, loyalty to al Qaeda, and no remorse or regret for his crimes. Ex. 3 at 2-3; Ex. 4 at 2-3.

Based on such actions and statements, the Attorney General concluded there is a likelihood that

Plaintiff would, if given the opportunity, attempt to radicalize others and attempt to advocate or incite terrorism and violence. Ex. 3 at 2-3, 16-17; Ex. 4 at 2-3, 16-17. For these reasons, the Attorney General implemented restrictions on Plaintiff's communications, which are rationally related to the government's legitimate penological interest in protecting national security.

Plaintiff challenges all of the restrictions in the SAMs and seeks a permanent injunction ordering them removed and barring any future Attorneys General from issuing new SAMs. Dkt. 76 ¶¶ 289-316, Prayer for Relief. Plaintiff repeatedly asserts that his rights are being violated. But nowhere in the complaint does he show, based on alleged facts (as opposed to conclusory assertions), that the government lacks any legitimate, rational basis for the restrictions.

Plaintiff's primary complaint appears to be that he is unable to communicate "with more than 7.5 billion people, the vast majority of people on the planet." Dkt. 76 ¶ 7. As noted above, the SAMs permit Plaintiff to communicate with his immediate family, his authorized contact list, his attorneys and related legal providers, his consular representatives, non-terrorist inmates, U.S. courts, federal judges, U.S. Attorney's Offices, members of the U.S. Congress, the Bureau of Prisons, and federal law enforcement entities. Ex. 4. Plaintiff is further permitted to request any additional contacts, which are evaluated on a case-by-case basis. *Id.* at 9 n.7. This process allows the government to evaluate each proposed new contact to ensure that Plaintiff's communications and visits with such persons would not threaten national security. There is an obvious, rational connection between this restriction and Plaintiff's crime, his prior attempt to exhort others to engage in jihad through his martyrdom video, and his voluminous statements asserting an obligation to engage in jihad and desire to harm the United States. The United States is permitted to proactively prevent Plaintiff from attempting to engage in, incite, or otherwise encourage

further terrorist attacks. The government is not required to permit Plaintiff's unfettered communications until such time as he may orchestrate another attack.

Plaintiff also complains that he is unable to communicate with the media. Dkt. 76 ¶ 153. But there is a clear rational connection between this restriction and the legitimate penological interest in preventing Plaintiff from using the media to advocate or incite terrorist, criminal, and/or violent offenses. Ex. 4 at 16-17. The SAMs specifically references that prior to his attempted bombing, Plaintiff recorded a video for al Qaeda in which he sought to incite others to engage in jihad, like he was about to do.[7] *Id.* at 2.

Finally, Plaintiff challenges that he is not permitted to communicate with his nieces and nephews.[8] Dkt. 76 ¶ 308. Plaintiff appears to argue that there is no legitimate penological interest for this restriction because most of his nieces and nephews are minors. *Id.* ¶ 140. But this allegation alone fails to demonstrate that there is no rational basis for the restriction. Children, of

[7] Plaintiff also alleges that the SAMs restrict his access to books, but the SAMs provide that he "may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution." Ex. 4 ¶ 9. This restriction is lawful. To the extent Plaintiff disagrees with any particular denial, he may file administrative remedies, and if still unhappy, he may then file suit for access to the book. But as detailed in the accompanying motion for partial summary judgment, Plaintiff has never exhausted any administrative remedies with respect to access to any particular reading materials.

Plaintiff likewise offers various allegations about access to attorneys. Plaintiff obviously has attorneys at this time. If he wishes to obtain other attorneys, he merely needs to notify his Unit Team, and he will be permitted to contact other lawyers. But such hypothetical issues are not presently before the Court. Again, if Plaintiff has particular issues regarding communications with his attorneys, he may file administrative remedies regarding such issues, and if that does not resolve his concern, he may then file suit on the limited question. But there is plainly a legitimate, rational basis for including attorney communication protocols within the SAMs. *See United States v. Stewart*, 590 F.3d 93, 100-08 (2d Cir. 2009).

[8] As discussed in the accompanying motion for summary judgment, the Court should not reach this issue because Plaintiff did not first exhaust his administrative remedies related to his request to communicate with his nieces and nephews.

course, are highly vulnerable to influence. The government has a legitimate interest in preventing Plaintiff from attempting to inspire or otherwise recruit any of his young family members from following in his path and becoming a terrorist. Because there is a rational relationship between the SAMs restrictions and the government's legitimate penological interest in protecting national security, the restrictions do not violate the Constitution.

Besides conclusory assertions that the government has no rational justification for the restrictions, Plaintiff offers no facts that would eliminate the government's stated justifications in the SAMs. *See* Ex. 3, 4 (detailing justifications). He does not contest that he attempted to blow up an airliner based on a purported religious obligation to engage in jihad, or that he taped a video released by al Qaeda in which he exhorted other to engage in jihad, or that he made various statements in court and to government officials that he had a religious obligation to engage in jihad, is proud to kill in the name of god, and desires to harm the United States, among others. His new allegations in his Amended Complaint rebut none of the stated justifications.

First, Plaintiff alleges that he has not received any disciplinary charges for violence while incarcerated. Dkt. 76 ¶ 85. This is a complete red herring because the government has never justified the SAMs restrictions based on Plaintiff's violence in prison. *See* Ex. 3, 4. In any event, as Plaintiff's own allegations suggest, Plaintiff has no opportunity to engage in violence in the restrictive conditions at the ADX. This allegation is not sufficient to state a claim. *Al-Owhali*, 687 F.3d at 1241 (allegation that prisoner did not violate SAMs restrictions did not state a claim that SAMs restrictions were unconstitutional).

Second, Plaintiff alleges, in his Amended Complaint, that he no longer wishes to engage in jihad and wants to live in "peace and calm." Dkt. 76 ¶ 86. This too fails to state a claim for

numerous reasons. Plaintiff does not allege that he has ever told this information to any government officials, even though he admits he has opportunity to provide information each year while the SAMs are reevaluated. *Id.* ¶ 126. Without having apprised any officials of his supposed change of heart, it is impossible to suggest the officials lacked a rational justification.

More fundamentally, even if Plaintiff had told officials he will not engage in jihad in the future—which he does not allege—officials would not be obliged to believe him. Plaintiff misunderstands the relevant *Turner* standard, which does not focus on whether the challenged restrictions are actually necessary, but whether Defendants might rationally believe they advance the stated national security interests. *See Johnson*, 543 U.S. at 513 (*Turner* does not require proof that the policy advanced the stated goal, but only that the officials "might reasonably have thought" it would); *Sperry v. Werholtz,* 413 F. App'x 31, 40 (10th Cir. 2011) ("[I]t 'does not matter whether we agree with' the defendants or whether the policy 'in fact advances' the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests." (quoting *Amatel v. Reno,* 156 F.3d 192, 199 (D.C. Cir. 1998)); *Mauro v. Arpaio,* 188 F.3d 1054, 1060 (9th Cir. 1999) (same); *Bruscino v. Pugh*, No. 02-cv-02362-LTB-PAC, 2006 WL 980580, at *8 (D. Colo. Apr. 11, 2006) (same).

Just as officials are not required to remove cell locks simply because an inmate alleges he will not escape, officials are not required to remove restrictions when a convicted terrorist alleges he will not engage in jihad. Because officials cannot know with certainty Plaintiff's true beliefs, they must exercise predictive judgment. Plaintiff lied in order to enter the United States to try blow up a plane kill and 289 people on board, and has said he has a religious obligation to

engage in jihad. Plaintiff offers no reason why any reasonable person might not rely on that history. The Supreme Court has emphasized that courts must grant substantial deference to the government's predictive judgment and uphold the restrictions if there is any rational basis. *Overton*, 539 U.S. at 132; *Humanitarian Law Project*, 561 U.S. at 34-35. Plaintiff's limited allegations cast no doubt on the fact that Defendants might reasonably believe that the SAMs restrictions advance their national security interests in light of Plaintiff's crime, his martyrdom video imploring others to engage in jihad, and his numerous statements detailed above.[9] As a result, he fails to state a claim.[10]

**B.** **The SAMs do not violate Plaintiff's substantive due process rights (Claim 5).**

In claim 5, Plaintiff merely repeats his allegations regarding the SAMs and alleges that by prohibiting him "from communicating with all but a small group of narrowly defined family members," the defendants are purportedly violating his substantive due process rights. Dkt. 76 ¶¶ 314-15. The Supreme Court and the Tenth Circuit have repeatedly rejected such duplicative claims. Because the Supreme Court has "always been reluctant to expand the concept of substantive due process," it has repeatedly held that "where a particular Amendment provides an

---

[9] Notably, Plaintiff does not allege that any of his actions were wrong, that he has remorse for his conduct, or that he disavowed any of his prior statements.

[10] Plaintiff also alleges that there are other inmates, whom he believes committed similar crimes, that are not subject to SAMs restrictions. Dkt. 76, ¶¶ 129-38. But such allegations are irrelevant. The standard is not a least restrictive means test. Plaintiff's personal views about other inmates do not cast doubt on whether there is a logical relationship between *him* and *his* restrictions. In any event, Defendants have a reasonable basis for believing that Plaintiff is dangerous to the national security of the United States because of his ties and allegiance to al Qaeda and his willingness to recruit others for al Qaeda, having taped a martyrdom video imploring others to engage in jihad. This type of predictive judgment regarding the relative dangers of various inmates is exactly the type of decision that mandates deference and is not subject to judicial scrutiny. *Block v. Rutherford*, 468 U.S. 576, 588 (1984) ("emphasiz[ing] that we are unwilling to substitute our judgment on these difficult and sensitive matters" relating to security).

explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998) (internal quotations and citations omitted); *see also Conn v. Gabbert*, 526 U.S. 286, 293 (1999); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality); *Graham v. Connor*, 490 U. S. 386, 395 (1989); *Gehl Grp. v. Koby*, 63 F.3d 1528, 1539 (10th Cir. 1995) (same).

In this case, Plaintiff's substantive due process claim concerning the communications limitations in his SAMs is entirely duplicative of his First Amendment claims (Claims 2-4). Plaintiff may not seek to gain additional protections through substantive due process. "[S]ubstantive due process does not provide additional protections where, as here, it would be duplicative of other constitutional claims in the lawsuit. Plaintiff's claim will rise and fall on his First Amendment theory, not substantive due process." *Walker v. Scherbarth*, No. 15-CV-00823-MJW, 2015 WL 5697366, at *4 (D. Colo. Sept. 29, 2015), *aff'd*, 676 F. App'x 815 (10th Cir. 2017); *see also Al-Owhali*, 2010 WL 5651033, at *9, *adopted in relevant part*, 2011 WL 288523, at *3 (rejecting substantive due process challenge to SAMs as duplicative).

In any event, Plaintiff falls short of alleging a substantive due process violation. In order to state a claim, Plaintiff must allege conduct "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of Sacramento*, 523 U.S. at 847 & n.8. "The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges." *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006)). This Court and the Tenth Circuit have upheld challenges to communications

restrictions in SAMs. *Gowadia*, 596 F. App'x at 673-74; *Al-Owhali*, 687 F.3d at 1240-43;

*Nicholson*, 2017 WL 4337896, at *4-7; *Salim v. Lynch*, No. 1:13-cv-03175-RM-CBS (D. Colo.

Nov. 30, 2016) (Dkt. 95); *Ayyad*, 2014 WL 4747451, at *29. The fact that similar restrictions

have been upheld demonstrates that such restrictions for an unrepentant terrorist do not shock the

conscience. Further, the restrictions are rationally related to legitimate penological interests, as

described above, and are thus constitutional under *Turner*. Finally, the imposition of a SAMs

does not implicate any protected liberty interest, thus further barring the claim. *Gowadia*, 596 F.

App'x at 674; *Salim v. Lynch*, No. 1:13-cv-03175-RM-CBS (D. Colo. Nov. 30, 2016) (Dkt. 95);

*Yousef v. United States*, No. 1:12-cv-02585-RPM, 2014 WL 1908711, at *5 (D. Colo. May 13,

2014). For all of these reasons, the substantive due process claim should be dismissed.

**III.**    **Plaintiff lacks standing to challenge the BOP's actions related to his hunger strikes in 2012 and 2015 and, in any event, the claims lack merit (Claims 6-7, 11-13).**

In claims 6-7 and 11-13, Plaintiff challenges various BOP actions related to hunger

strikes that he undertook in 2012 and 2015. Plaintiff seeks purely prospective relief, asking the

Court to enjoin the BOP from force-feeding him or taking any other actions in response to any

hypothetical future hunger strikes that he might undertake at some unspecified future date.

Because Plaintiff did not face any certainly impending injury at the time he filed his complaint,

he lacks standing to seek prospective relief. But even if he had standing, federal courts have

uniformly ruled that force-feeding hunger-striking inmates is justified based on the government's

compelling interests to preserve the inmate's health and to maintain prison order and discipline.

**A.**    **Plaintiff lacks standing to seek prospective declaratory and injunctive relief based on allegations of conduct in 2012 and 2015.**

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and

'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Id.* "To establish Article III standing, an injury must be "[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Id.* at 409. The party invoking federal jurisdiction bears the burden of establishing standing. *Id.* at 411-12. In this case, the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 408.

Where, as here, a plaintiff seeks prospective relief, he must demonstrate that he is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."[11] *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *see also Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991) (same). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact," *Amnesty Int'l*, 568 U.S. at 409 (emphasis in original; internal quotations omitted); *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2 (1992).

Allegations of potential "injury at some indefinite future time" are insufficient because the Court has "insisted that the injury proceed with a high degree of immediacy." *Defenders of Wildlife*, 504 U.S. at 564 n.2; *Sierra Club v. Robertson*, 28 F.3d 753, 758 (8th Cir. 1994) ("[T]he Court invariably has 'insisted that the injury proceed with a high degree of immediacy.'");

---

[11] The Supreme Court has emphasized that a plaintiff must demonstrate standing separately for each claim and for "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Lyons*, 461 U.S. at 109.

*Branton v. FCC*, 993 F.2d 906, 910 (D.C. Cir. 1993) (same). "[W]ithout any description of concrete plans, or indeed even any specification of *when* the someday will be," there can be no "finding of the 'actual or imminent' injury that our cases require." *Defenders of Wildlife*, 504 U.S. at 564; *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016). It is likewise not enough to "observe that the challenged conduct is repeatable in the future" or "that the purportedly illegal practice is commonly used." *Lebron v. Rumsfeld*, 670 F.3d 540, 561 (4th Cir. 2012) (citing *Golden v. Zwickler*, 394 U.S. 103, 109 (1969); *Lyons*, 461 U.S. at 106)).

In this case, Plaintiff alleges that he was force-fed after undertaking hunger strikes in August 2012, October 2012, and July 2015. Dkt. 76 ¶¶ 218, 231, 233. Based on these three allegations from years ago, Plaintiff brings various claims concerning the BOP's actions during the hunger strikes, requesting purely prospective relief, including a "permanent injunction prohibiting Defendant BOP from force-feeding" him under any circumstances. *Id.* at Claims 6-7, 11-13, Prayer for Relief. Plaintiffs' years-old allegations fail to meet his burden to demonstrate that he faced a certainly impending injury at the time he filed his initial complaint. At bottom, Plaintiff's standing argument is based on speculation that he *may* undertake a hunger strike at some future unspecified time, and the BOP *may* force-feed him. Indeed, during his last two hungers strikes, medical staff determined that no intervention was necessary.[12] Ex. 6, Dkt. 76 ¶ 243. Plaintiff merely points to past conduct and suggests it is repeatable in the future, exactly

---

[12]  Plaintiff omits any allegations regarding his October 2015 hunger strike; however, this Court may consider it in evaluating where Plaintiff has standing to sue. The medical records show that Plaintiff started a hunger strike in October 2015 because he was not receiving double-portion meals. Ex. 6. The medical staff determined that no intervention was necessary, even after missing 40 meals. *Id.* Likewise, Plaintiff alleges that he went on a hunger strike after filing his original complaint, but medical staff did not intervene. Dkt. 76 ¶ 243.

the type of claim that has been repeatedly rejected. As a result, Plaintiff lacks standing to bring any of his challenges concerning the BOP's alleged past acts in 2012 and 2015.

The Court should dismiss Claims 6-7 and 11-13 for lack of standing, but these principles apply with even greater force to two of Plaintiff's allegations. First, in Claim 6, Plaintiff alleges that in 2012, the BOP retaliated against him by placing him in a Special Housing Unit (Range 13). Dkt. 76 ¶¶ 317-26. An allegation that the BOP retaliated against Plaintiff more than five years ago is insufficient to establish a certainly impending future injury necessary for standing to obtain prospective relief, especially where Plaintiff does not allege this conduct repeated.

Likewise, these principles apply with even greater forcer to the extent Plaintiff relies on his conclusory assertion that medical staff ordered force-feeding in 2012 or 2015 without medical necessity, in contravention of BOP regulations. Such allegations do not give rise to a claim for certainly impending future injury. BOP regulations do not permit force-feeding without a physician determining that "an inmate's life or health will be threatened if treatment is not initiated immediately." 28 C.F.R. § 549.65. Plaintiff's claim therefore depends on a speculative chain of future events, culminating in Plaintiff's speculation that an unidentified BOP physician may deliberately violate BOP regulation and order him force-fed without medical necessity.[13] Such a claim is wholly speculative and falls woefully shorts of meeting Plaintiff's burden to demonstrate a certainly impending future injury. For similar reasons, this claim is not ripe for judicial review. "A claim is not ripe for adjudication if it rests upon contingent future events that

---

[13]  Even if the Court were to accept Plaintiff's conclusory allegation that a prior physician ordered Plaintiff force-fed without medical necessity, the allegation does not support the inference that a different future physician will act in the same manner during some hypothetical future hunger strike. *Lyons*, 461 U.S. at 109 (past chokehold was not sufficient to demonstrate a real and immediate threat of a future chokehold necessary for standing).

may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S.

296, 300, 118 S. Ct. 1257, 1259, 140 L. Ed. 2d 406 (1998) (quotation marks omitted). Here, the

entire allegation is based wholly on speculation as to events that may not occur. Because Plaintiff

faces no certainly impending injury based on these allegations, and because this claim is entirely

dependent on contingent future events, the Court lacks jurisdiction to hear this allegation.

**B.**    **Plaintiff also fails to state a claim that force-feeding violates his rights (Claims 7, 11, 13).**

**1.**    **Force-feeding a hunger-striking inmate does not violate the Constitution (Claims 7, 13).**

In Claims 7 and 13, Plaintiff alleges that force-feeding him while on a hunger strike will

violate his constitutional rights by denying him the right to refuse medical treatment and

constituting cruel and unusual punishment. The federal courts have repeatedly rejected this

claim, holding that force-feeding inmates on a hunger strike does not violate the Constitution.

*Aamer v. Obama*, 742 F.3d 1023, 1039-41 (D.C. Cir. 2014); *Owens v. Hinsley*, 635 F.3d 950,

955 (7th Cir. 2011); *Freeman v. Berge*, 441 F.3d 543, 546-47 (7th Cir. 2006); *In re Grand Jury

Subpoena*, 150 F.3d 170, 172 (2d Cir. 1998); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir.

1992); *Garza v. Carlson*, 877 F.2d 14, 17 (8th Cir. 1989); *In re Soliman*, 134 F. Supp. 2d 1238

(N.D. Ala. 2001), *vacated as moot*, 296 F.3d 1237 (11th Cir. 2002); *see also Bezio v. Dorsey*,

989 N.E.2d 942, 950-51 (N.Y. 2013); *Laurie v. Senecal*, 666 A.2d 806, 809 (R.I. 1995); *Comm'r

of Corr. v. Coleman*, 38 A.3d 84, 95-97 (Conn. 2012). In fact, various courts have held that *not*

force-feeding inmates in need of care would violate the Eighth Amendment. *Owens*, 635 F.3d at

955 (holding officials have "a right and a duty to step in and force an inmate to take nourishment

if a hunger strike has progressed to the point where continuation risks serious injury or death").

BOP's regulations governing management of inmates engaging in hunger strikes "authorize medical officers to force-feed an inmate if they determine that the inmate's life or permanent health is in danger." *Martinez*, 977 F.2d at 423; *see* 28 C.F.R. §§ 549.60-66. The regulations provide that "[w]hen, as a result of inadequate intake or abnormal output, a physician determines that the inmate's life or health will be threatened if treatment is not initiated immediately," then "staff shall make reasonable efforts to convince the inmate to voluntarily accept treatment," but if such efforts fail, or in an emergency, "the physician may order that treatment be administered without the consent of the inmate." 28 C.F.R. § 549.65.

Under *Turner*, 482 U.S. at 89, the BOP's actions and regulations must be upheld if they are "reasonably related to legitimate penological interests." *Id.* As noted earlier, in undertaking such analysis, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. Again, the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Id.*

Applying the *Turner* test, federal courts have uniformly held that force-feeding a hunger-striking inmate in need of care furthers "compelling government interests, such as the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline." *In re Grand Jury Subpoena*, 150 F.3d at 172; *see also Aamer*, 742 F.3d 1023, 1039 (recognizing interests in preserving lives and maintaining security and discipline); *Freeman*, 441 F.3d at 547 ("If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the

other. Prison officials who let prisoners starve themselves to death would also expose themselves to lawsuits by the prisoners' estates."); *Garza*, 877 F.2d at 17 (holding the "preservation of prisoners' health is certainly a legitimate objective"); *Wilson v. Hardy*, No. 11 C 6862, 2012 WL 400927, at *2 (N.D. Ill. Feb. 7, 2012) ("Correctional officers are responsible for the prisoner and they cannot allow him to take actions that would result in his own injury."); *Bezio*, 989 N.E.2d at 950 ("[T]here is virtually universal recognition among appellate courts that an inmate hunger strike can have a significant destabilizing impact on the institution[.]"). Accordingly, based on these established compelling interests, the federal courts have uniformly concluded that force-feeding a hunger-striking inmate does not violate the Constitution. This Court should rule likewise and dismiss Plaintiff's allegations in Claims 7 and 13 as well as his request to enjoin BOP from force-feeding him in the future.

To the extent Plaintiff refocuses his challenge on his conclusory assertion that BOP medical staff ordered him force-fed without medical necessity during any past hunger strike, that claim fails for numerous reasons. First, past medical judgment from multiple years ago cannot serve as the basis to establish standing for future prospective relief. As explained earlier, Plaintiff may not obtain prospective relief based on speculation as to the medical judgment that may be exercised at some hypothetical time by some unidentified physician in the future. Second, in any event, disagreements with medical judgment do not rise to the level of a constitutional violation. *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997); *Sherman v. Klenke*, 653 F. App'x 580, 588 (10th Cir. 2016) (explaining courts do not sit as "a medical review board" and where there is a "disagreement with considered medical judgment, we will not second guess the doctors"). Third, Plaintiff's conclusory allegations without any specific facts, including any allegations as

to the state of mind of the BOP physician(s), is not sufficient to state a constitutional claim. Under *Iqbal*, Plaintiff is required to allege specific facts, and not just his personal belief that medical intervention was unnecessary. Fourth, Plaintiff never exhausted this claim, as explained in the motion for partial summary judgment. In sum, Plaintiff's conclusory assertion that medical intervention was unnecessary during any prior hunger strike fails to save his claims.

> **2.** **Force-feeding Plaintiff during a hunger strike does not violate RFRA (Claim 11).**

In Claim 11, Plaintiff alleges that force-feeding him violates RFRA. Plaintiff alleges that he undertook hunger strikes in August 2012, October 2012, and July 2015 to protest harassment and that he was prohibited from communicating with his sister. Dkt. 76 ¶¶ 218, 231, 233. Plaintiff alleges that he hunger strikes to protest what he believes to be "unconstitutional and illegal conditions of confinement." *Id.* ¶ 216. Plaintiff alleges that force-feeding him "imposes a substantial burden on his exercise of religion because hunger-striking is the only way [Plaintiff] can show Allah that he does not tolerate and accept Defendants and other inmates continually insulting his religion." *Id.* ¶ 364. This claim must be rejected because force-feeding is the least restrictive means to further the government's compelling interests.

Even assuming Plaintiff's hunger striking is motivated by a sincerely held religious belief, the BOP's well-established compelling interests justify force-feeding a hunger-striking inmate. Under RFRA, even if a government action substantially burdens a person's free exercise of religion, that action must be upheld where the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(b). In conducting this analysis, "[c]ourts should continue to give 'due deference to

the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Werner v. McCotter*, 49 F.3d 1476, 1479-80 (10th Cir. 1995) (quoting S. Rep. No. 111, 103d Cong., 1st Sess. 9-11, reprinted in 1993 U.S.C.C.A.N. 1892, 1900) (superseded by statute on other grounds).

In this case, both prongs of the test are met. As discussed previously, there are well-established compelling government interests when a hunger-striking inmate's health is in jeopardy. These interests include "the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline."[14] *In re Grand Jury Subpoena*, 150 F.3d at 172; 139 Cong. Rec. S14,468 (daily ed. Oct. 27, 1993) (statement of Sen. Hatch) ("[P]rison officials clearly have a compelling interest in maintaining order, safety, security, and discipline. The sponsors of this bill have emphasized this point repeatedly.") (cited approvingly in *Kikumura v. Hurley*, 242 F.3d 950, 962 (10th Cir. 2001)); *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) ("prison security is a compelling state interest" and "deference is due to institutional

---

[14] The compelling nature of the interest is further demonstrated by the fact that, under the Eighth Amendment, prison officials have "a duty to step in and force an inmate to take nourishment if a hunger strike has progressed to the point where continuation risks serious injury or death." *Owens*, 635 F.3d at 955; *see also, e.g., Anderson v. Colo. Dep't of Corr.*, No. 16-cv-02113-CMA-MJW, 2017 WL 6033681, at *8 (D. Colo. Sept. 27, 2017) (quoting *Owens* approvingly); *Aamer v. Obama*, 953 F. Supp. 2d 213, 221 (D.D.C. 2013) ("Numerous courts have recognized the Government's affirmative duty to prevent suicide and to provide life-saving nutritional and medical care to persons in custody."). The Tenth Circuit and other courts have repeatedly analyzed Eighth Amendment claims for inadequate medical care during a hunger strike, recognizing that where a medical provider believes care and nourishment are required to prevent serious harm, care must be provided even when refused by a hunger-striking inmate. *Williams v. Miller*, 696 F. App'x 862, 869 (10th Cir. 2017); *Austin v. Tennis*, 381 F. App'x 128, 133 (3d Cir. 2010); *Anderson*, 2017 WL 6033681, at *8. That the Constitution mandates care in these circumstances clearly establishes that the government's interest here is of the highest order.

officials' expertise in this area"). Given the uniform acknowledgement of these interests, including in the context of hunger-striking inmates, there can be no doubt that the government has compelling interests in preserving inmate health and maintaining order and discipline.

Under the second prong, the government must show that "it lacks other means of achieving its desired goal." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 815 (2000). The government "need not refute every conceivable alternative, but [it] 'must refute the alternative schemes offered by the challenger.'" *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012) (quoting *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011)).

Here, there are no less restrictive alternatives that would achieve the government's desired goals. The government has compelling interests in both preserving the health of the inmate and maintaining order and discipline. When a hunger-striking inmate is in need of medical care and refuses to voluntarily accept such care, the BOP has determined, based on its substantial expertise, to "authoriz[e] medical officers to force-feed an inmate if they determine that the inmate's life or permanent health is in danger." *Martinez*, 977 F.2d at 423; *see also* 28 C.F.R. § 549.65. This approach achieves both of the government's compelling interests.

Neither of the other two potential alternatives achieves both compelling interests. First, if the government allows the inmate to continue hunger striking without care, that would place the inmate at serious risk of harm or death. As discussed above, this is not a viable alternative. Allowing the inmate to harm himself would plainly not achieve either of the government's

compelling interests, both because the inmate's health would be placed in serious jeopardy and because it would disrupt the order and discipline of the prison. *Freeman*, 441 F.3d at 547.

Alternatively, if the government simply acceded to the inmate's demands (hoping the inmate would voluntarily end the hunger strike), that alternative would destroy the government's compelling interest in maintaining order and discipline. Giving in to demands will "lead other inmates to 'copy the same tactic, manipulating the system to get a change in conditions.'" *Aamer*, 742 F.3d at 1040 ((quoting *Bezio*, 989 N.E.2d at 951)). Obviously, if the BOP were required to accede to demands during every hunger strike, that would severely harm order and discipline, leading to never-ending hunger strikes by prisoners seeking to rewrite the rules. *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) (explaining that "[a] prisoner cannot force the prison to change its rules by going on a hunger strike"); *Dep't of Homeland Sec. v. Ayvazian*, No. 15-23213-CIV, 2015 WL 5315206, at *4 (S.D. Fla. Sept. 11, 2015) (explaining that hunger striking inmates present the agency with three options: (1) allow them to die, (2) force-feed them, or (3) submit to their demands and concluding that "[o]ptions 1 and 3 are not reasonable" leaving the agency "with the single option of involuntarily administering nutrients and hydration"—"the only viable response"). Because force-feeding is the only alternative that would achieve both of the government's compelling interests, it is the least restrictive means. The Court should therefore dismiss Plaintiff's RFRA claim.

**IV.** **The Supreme Court and Tenth Circuit have rejected "overall condition" claims under the Eighth Amendment (Claim 14).**

In his final claim, Plaintiff alleges that all of his conditions of confinement—the "totality of circumstances"—combine to constitute cruel and unusual punishment. Dkt. 76 ¶¶ 384-95. Both the Supreme Court and the Tenth Circuit have rejected such a challenge. "Nothing so

amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991). Under the Eighth Amendment, conditions may only be analyzed in combination "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Id.* at 304 Thus, in order to state a claim, "a plaintiff must allege an 'unquestioned and serious deprivation of basic human needs,' such as 'food, warmth, or exercise.'" *Gowadia*, 596 F. App'x at 674 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) and *Wilson*, 501 U.S. at 304). Based on this precedent, the Tenth Circuit and this Court have repeatedly held that conditions at the ADX, as alleged by Plaintiff and other inmates, do not violate the Eighth Amendment. *Gowadia*, 596 F. App'x at 674; *Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003); *Ajaj v. United States*, 293 F. App'x 575, 582–84 (10th Cir. 2008); *Davis v. Fed. Bureau of Prisons*, No. 15-CV-0884-WJM-MJW, 2016 WL 1156755, at *6 (D. Colo. Mar. 24, 2016); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1250-51 (D. Colo. 2011).

Plaintiff fails to allege that he was denied any basic human need, such as food, warmth, or exercise. Instead, Plaintiff alleges exactly the amorphous claim that the Supreme Court held insufficient, making a conclusory assertion that his various conditions of confinement somehow combine to deny Plaintiff the minimal civilized measures of life's necessities. Dkt. 76 ¶ 392. As a result, this claim must be dismissed under established law.

Plaintiff's suggestion that his conditions combine to deny social interaction is meritless. Dkt. 76 ¶ 392. To begin with, the Tenth Circuit has never determined that a lack of social interaction could rise to an Eighth Amendment violation. *Silverstein v. Fed. Bureau of Prisons*,

559 F. App'x 739, 755-56 (10th Cir. 2014). More importantly, the Tenth Circuit has held that even if such claim could theoretically exist, Plaintiff's allegations, which demonstrate that he has some social interaction, cannot meet the standard. *Id.* Indeed, in *Silverstein*, the Tenth Circuit held that housing an inmate at Range 13 for three years—which Plaintiff alleges is far more isolated and involves far less social contact than his conditions in H-Unit, Dkt. 76 ¶ 33—does not violate the Eighth Amendment. 559 F. App'x at 755-56. Nor is there any basis to Plaintiff's suggestion that force-feeding him while on a hunger strike or allegedly denying him halal meals combines to deprive him of social stimuli. Plaintiff is simply lumping his claims together in exactly the fashion that the Supreme Court held to be impermissible. In light of the precedent holding that Plaintiff's conditions do not violate the Eighth Amendment, the Court must dismiss this claim.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Claims 1-7 and 11-14.

Dated May 11, 2018                    Respectfully Submitted,

                                      ROBERT C. TROYER
                                      United States Attorney

                                      *s/ David Z. Moskowitz*
                                      David Z. Moskowitz
                                      Assistant United States Attorney
                                      1801 California Street, Suite 1600
                                      Denver, Colorado 80202
                                      Telephone:(303) 454-0100
                                      Fax: (303) 454-0407
                                      david.moskowitz@usdoj.gov
                                      Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2018, I electronically filed the foregoing with the Clerk

of Court using the ECF system, which will send notification of such filing to the following email

addresses:

gjohnson@johnsonklein.com
arandolph@johnsonklein.com

*s/ David Z. Moskowitz*
Office of the U.S. Attorney