IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17–cv–02493–RM–KMT

UMAR FAROUK ABDULMUTALLAB,

      Plaintiff,

v.

JEFFERSON SESSIONS, Attorney General of the United States, in his official capacity,
FEDERAL BUREAU OF PRISONS,
JOHN DOES 1 THROUGH 20, in their official capacities,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Kathleen M. Tafoya**

      This matter comes before the court on Defendants' "Motion to Dismiss Amended Complaint [76]" (Doc. No. 79 [Mot.], filed May 11, 2018).  Plaintiff filed his response on June 8, 2018 (Doc. No. 93 [Resp.]), and Defendants filed their reply on June 28, 2018 (Doc. No. 103 [Reply]).

## STATEMENT OF THE CASE

      Plaintiff is an inmate housed at the United States Penitentiary–Administrative Maximum ("ADX") in Florence, Colorado.  (Doc. No. 76 [Am. Compl.], filed April 14, 2018, ¶ 4.) Plaintiff is serving four terms of life imprisonment plus 50 years for his convictions for the attempted use of a weapon of mass destruction on a commercial airliner that landed in Detroit Michigan, and the attempted murder of the 289 people on board.  (*Id.*, ¶1.)  ADX is the highest

security prison operated by the Federal Bureau of Prisons ("BOP"). (*Id.*) Before transferring

Plaintiff to long-term solitary confinement at ADX, the United States government placed

Plaintiff under Special Administrative Measures ("SAMs"). (*Id.*, ¶ 7.)

The SAMs allow Plaintiff to communicate through writing, calls, and personal visits with

his immediate family, his list of authorized contacts (including his step-sisters, uncle, and step-

mother), and his attorneys and related legal providers. (Mot., Ex. 4[1], ¶¶ 1.c, 2, 3.) Plaintiff is

allowed to communicate and visit with consular representatives (*id.* ¶ 11), as well as to

communicate with the U.S. courts, federal judges, U.S. Attorney's Offices, members of the U.S.

Congress, the Bureau of Prisons, and federal law enforcement entities (*id.*, ¶ 3.g). Plaintiff is

permitted to communicate with non-terrorist inmates during predesignated times. (*Id.*, ¶ 1.c.)

Plaintiff is otherwise prohibited from communicating with other persons, but he may request

additional approved contacts, who are evaluated "on a case-by-case basis." (*Id.* at 9 n.7.)

Plaintiff may access mass communications, including television, newspapers, books, and other

publications so long as they do not facilitate criminal activity, harm national security, or harm

the security, good order, or discipline of the institution. (*Id.*, ¶ 8–9.) Plaintiff is not permitted to

communicate with the media. (*Id.*, ¶ 4.) The Department of Justice found that such restrictions

are reasonably necessary to prevent Plaintiff from committing, soliciting, or conspiring to engage

in additional criminal activity, to prevent him from receiving and acting upon critically timed

messages, and to prevent him from advocating or inciting terrorist, criminal, and/or violent

offenses. (*Id.* at 16–17.)

---

[1] The court takes judicial notice the March 2012 SAMs, as the document is referred to in the complaint and is central to Plaintiff's claims. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Plaintiff brings this civil action with 14 claims challenging his conditions of confinement. In Claim 1, Plaintiff alleges that his transfer to the ADX in 2012 violated due process. (Compl., ¶¶ 284–88.) In Claims 2 through 5, Plaintiff alleges his SAMs violate the First and Fifth Amendments. (*Id.*, ¶¶ 289–316.) In Claims 6, 7, 11, 12, and 13, Plaintiff alleges the BOP's actions related to his hunger strikes in 2012 and 2015 violated the First, Fifth, and Eighth Amendments, as well as the Religious Freedom Restoration Act ("RFRA"). (*Id.*, ¶¶ 317–33, 359–83.) In Claims 8, 9, and 10, Plaintiff alleges that the BOP violated RFRA by denying group prayer with other inmates, regular access to an imam, and a halal diet. (*Id.*, ¶¶ 334–58.) In Claim 14, Plaintiff alleges that the overall conditions of his confinement constitute cruel and unusual punishment. (*Id.*, ¶¶ 384–95.) Plaintiff seeks purely prospective declaratory and injunctive relief for the alleged violations. (*Id.* at 82–83.)

Defendants move to dismiss Claims 1 through 7 and 11 through 14 of Plaintiff's Amended Complaint.[2] (Mot.)

## STANDARDS OF REVIEW

### A. *Lack of Subject Matter Jurisdiction*

Federal Rule of Civil Procedure Rule 12(b)(1) empowers a court to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case. Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)

---

[2] This court does not address Claims 1 and 6 in this Recommendation, as it previously recommended that Defendants be granted summary judgment on those claims for Plaintiff's failure to exhaust his administrative remedies. (Doc. No. 120.)

(recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *See Basso*, 495 F.2d at 909. The dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006); *see also Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004) (noting that dismissals for lack of jurisdiction should be without prejudice because a dismissal with prejudice is a disposition on the merits which a court lacking jurisdiction may not render).

A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971). When considering a Rule 12(b)(1) motion, however, the Court may consider matters outside the pleadings without transforming the motion into one for summary judgment. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Where a party challenges the facts upon which subject matter jurisdiction depends, a district court may not presume the truthfulness of the complaint's "factual allegations . . . [and] has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id*.

B.      ***Failure to State a Claim upon Which Relief Can Be Granted***

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the

parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id.* at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, the court may consider documents incorporated by reference, documents referred to in the complaint that are central to the claims, and matters of which a court may take judicial notice. *Tellabs, Inc*, 551 U.S. at 322 ; *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Publicly filed court records, including court transcripts, are subject to judicial notice. *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979); *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007); *Trusdale v. Bell*, 85 F. App'x 691, 693 (10th Cir. 2003).

## ANALYSIS

### A. Claims 2, 3, 4, and 5 Regarding SAMs

In Claims 2 through 5, Plaintiffs alleges that his SAMs violate his First and Fifth Amendment rights by restricting his communications and association with other persons. (Compl., ¶¶ 289–316.)

#### 1. Claims 2, 3, and 4—First Amendment

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court established a deferential standard for reviewing restrictions on prisoners' constitutional rights, holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This deferential standard reflects the principle that "[l]awful incarceration brings about the necessary withdrawal or

limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948), *overruled on other grounds by McCleskey v. Zant*, 499 U.S. 467 (1991); *see also Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (recognizing that inmates retain only those First Amendment rights "not inconsistent with their status as prisoners or with the legitimate penological objectives").

Based on *Turner*, the Supreme Court has repeatedly held that First Amendment rights are appropriately curtailed in prison and that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); *see also Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125–26 (1977). *Turner* is satisfied if officials, in their judgment, believe that the restriction would advance the desired goal. *See Johnson v. California*, 543 U.S. 499, 513 (2005) (observing that *Turner* does not require proof a policy advanced the goal, but only that officials "might reasonably have thought" it would); *Beard v. Banks*, 548 U.S. 521, 535 (2006) (upholding restriction even absent a showing that the restriction had "proven effective"). In conducting this analysis, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. "The burden, moreover, is not on the [government] to prove the validity of prison regulations but on the prisoner to disprove it." *Id.*

To survive a motion to dismiss, a prisoner must account for the "core holding" of *Turner* and therefore has the burden to plead facts showing the absence of a rational connection between the challenged restriction and any legitimate penological interests. *Al–Owhali v. Holder*, 687 F.3d 1236, 1239 (10th Cir. 2012). "Government conduct that would be unacceptable, even

outrageous, in another setting may be acceptable, even necessary, in a prison." *Gee*, 627 F.3d at

1186. Consequently, the complaint must show, through specific factual allegations, why the

government's justifications do not have a rational connection to the challenged restrictions. *Id.*

This generally requires a prisoner to " 'recite[ ] facts that might well be unnecessary in other

contexts to surmount a motion to dismiss.' " *Al–Owhali*, 687 F.3d at 1240 (quoting *Gee*, 627 F.

3d at 1185) (alteration in original). It is plaintiff's "burden to demonstrate that there is no

legitimate, rational basis" for the restrictions. *Id.* at 1241.

The government has a well-established legitimate penological interest in protecting

national security. *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012) (discussing the

"uniquely federal penological interest in addressing national security risks"). While prison

administrators are generally entitled to substantial deference, *Overton*, 539 U.S. at 132, that

deference is even greater in the realm of national security. *See Holder v. Humanitarian Law

Project*, 561 U.S. 1, 33–36 (2010); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017)

("courts traditionally have been reluctant to intrude upon the authority of the Executive in

military and national security affairs"); *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992)

(judicial deference "pervades the area of national security"); *Citizens for Peace in Space v. City

of Colo. Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007) (acknowledging "special deference" in

matters relating to national security "even when constitutional rights are invoked"). "[N]ational

security and foreign policy concerns arise in connection with efforts to confront evolving threats

in an area where information can be difficult to obtain and the impact of certain conduct difficult

to assess." *Humanitarian Law*, 561 U.S. at 34. "In this context, conclusions must often be based

on informed judgment rather than concrete evidence, and that reality affects what we may

reasonably insist on from the Government." *Id.* at 34–35. A court must defer to the government's predictive judgment in relation to national security because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment." *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988).

Based on this legitimate penological interest in protecting national security, the Tenth Circuit and this Court have repeatedly upheld SAMs restrictions nearly identical to the restrictions challenged here. *See, e.g., Gowadia*, 596 F. App'x at 673; *Al–Owhali*, 687 F.3d at 1241; *Nicholson v. Brennan*, No. 15–cv–01999–KLM, 2017 WL 4337896 (D. Colo. Sept. 28, 2017); *Salim v. Lynch*, No. 1:13–cv–03175–RM–CBS (D. Colo. Nov. 30, 2016) (Doc. No. 95). As the Tenth Circuit concluded in *Gowadia*, there is "an obvious and reasonable relationship between Gowadia's crimes and the measures the BOP implemented to restrict his communications." 596 F. App'x at 673.

Defendants argue that, in this case, there is an "obvious and reasonable relationship" between Plaintiff's crime, his statements under oath regarding his obligation to engage in jihad and desire to harm the United States, his martyrdom video encouraging others to answer the call of jihad, and the restrictions imposed in the SAMs. (Mot. at 16.) Defendants state that Plaintiff is a terrorist who was convicted of attempting to use a weapon of mass destruction—a "blessed weapon" in his words—to blow up a commercial airliner and kill 289 people on board.[3] (*Id.*, Ex.

_____

[3] In addition to the March 2012 SAMs, the court takes judicial notice of publicly-filed court records, including the trial transcripts from Plaintiff's criminal plea hearing, motion and sentencing hearing. *St. Louis Baptist Temple, Inc.*, 605 F.2d at 1172. Plaintiff argues that the court should decline to take judicial notice of the documents because Defendants seek the court judicial notice of not only the documents, "but also of the truth of the facts asserted in them." (Resp. at 4.) Plaintiff is incorrect. Defendants do not rely on the transcripts to prove what Plaintiff said during his trial or sentencing hearing is true. Rather, Defendants rely on the transcripts because it is beyond dispute

1.)  He testified that he believes jihad against the United States is among the most virtuous deeds, that he is obliged to participate in jihad and proud to kill in the name of God, and that the United States should await a great calamity that will soon befall them at the hands of the mujahedeen. (*Id.*, Exs. 1, 2.)  The district judge stated that "by his own words, defendant has shown that he continues to desire to harm the United States and its citizens, and that he views it as his religious obligation to do so" and that he "poses a significant, ongoing threat to the safety of American citizens everywhere."  (*Id.*, Ex. 2 at 54:8–10, 54:18–20.)  The Attorney General found there is a substantial risk that Plaintiff's communications or contacts with persons could result in death or serious bodily injury to persons.  (*Id.*, Ex. 3 at 3.)  This finding was based on numerous reasons, including his crime; his martyrdom video released by al Qaeda where he exhorted others to engage in jihad; and his own statements during his criminal proceedings and to government officials indicating that he has an obligation to conduct jihad against the United States, a desire to harm the United States, loyalty to al Qaeda, and no remorse or regret for his crimes.  (*Id.* at 2–3; Ex. 4 at 2–3.)  Based on such actions and statements, the Attorney General concluded there is a likelihood that Plaintiff would, if given the opportunity, attempt to radicalize others and attempt to advocate or incite terrorism and violence.  (*Id.*, Ex. 3 at 2–3, 16–17; Ex. 4 at 2–3, 16–17.)  For these reasons, the Attorney General implemented restrictions on Plaintiff's

---

that Plaintiff made certain statements, and therefore the court may take judicial notice of the statements.  Likewise, Defendants rely on the statement from the district court finding that Plaintiff "poses a significant, ongoing threat to the safety of American citizens everywhere" (Mot., Ex. 2 at 54:8-10), not as a conclusion, but as a statement that the government may reasonably rely upon in implementing SAMs restrictions.  Moreover, the SAMs are referenced throughout the complaint and central to Plaintiffs' claims (Compl. at 14-19, 43, 119-79, 289-316), and the document's authenticity is not disputed.  Prior courts evaluating challenges to SAMs restrictions have appropriately reviewed the SAMs in deciding a motion to dismiss.  *See, e.g.*, *Al-Owhali,* 2010 WL 5651033, at *10 n.3.

communications, which are rationally related to the government's legitimate penological interest in protecting national security.

Plaintiff challenges all of the restrictions in the SAMs and seeks a permanent injunction ordering them removed and barring any future Attorneys General from issuing new SAMs. (Compl., 76 ¶¶ 289–316, Prayer for Relief.) Plaintiff repeatedly asserts that his rights are being violated. However, the Amended Complaint is devoid of allegations to show that the government lacks any legitimate, rational basis for the restrictions.

Plaintiff complains that he is unable to communicate "with more than 7.5 billion people, the vast majority of people on the planet." (Compl., ¶ 7.) As noted above, the SAMs permit Plaintiff to communicate with his immediate family, his authorized contact list, his attorneys and related legal providers, his consular representatives, non-terrorist inmates, U.S. courts, federal judges, U.S. Attorney's Offices, members of the U.S. Congress, the Bureau of Prisons, and federal law enforcement entities. (Mot., Ex. 4.) Plaintiff is further permitted to request any additional contacts, which are evaluated on a case-by-case basis. (*Id.* at 9 n.7.) This process allows the government to evaluate each proposed new contact to ensure that Plaintiff's communications and visits with such persons would not threaten national security. There is an obvious, rational connection between this restriction and Plaintiff's crime, his prior attempt to exhort others to engage in jihad through his martyrdom video, and his voluminous statements asserting an obligation to engage in jihad and desire to harm the United States. The United States is permitted to proactively prevent Plaintiff from attempting to engage in, incite, or otherwise encourage further terrorist attacks.

Plaintiff also complains that he is unable to communicate with the media. (Compl., ¶ 153.) There is a clear rational connection between this restriction and the legitimate penological interest in preventing Plaintiff from using the media to advocate or incite terrorist, criminal, and/or violent offenses. (Mot., Ex. 4 at 16–17.) The SAMs specifically references that prior to his attempted bombing, Plaintiff recorded a video for al Qaeda in which he sought to incite others to engage in jihad, like he was about to do. (*Id.* at 2.)[4]

Besides conclusory assertions that the government has no rational justification for the restrictions, Plaintiff offers no facts that would eliminate the government's stated justifications in the SAMs. (*See* Mot., Exs. 3, 4.) Plaintiff does not contest that he attempted to blow up an airliner based on a purported religious obligation to engage in jihad, or that he taped a video released by al Qaeda in which he exhorted other to engage in jihad, or that he made various statements in court and to government officials that he had a religious obligation to engage in jihad, is proud to kill in the name of god, and desires to harm the United States, among others.

In his response, Plaintiff does not contest that national security is a legitimate penological interest. *Rezaq*, 677 F.3d at 1014. Plaintiff does not rebut any of the justifications for the SAMs. The SAMs rely on three justifications: (1) Plaintiff's crime; (2) his statements indicating a desire to harm the United States; and (3) his martyrdom video encouraging others to engage in jihad. (Mot., Ex. 3, 4.) In his response, Plaintiff complains that his own statements used by Defendants in their motion are too "inflammatory," and he that he made them six years ago. (Resp. at 5.)

_____

[4] Plaintiff also complains that he is not permitted to communicate with his nieces and nephews. (Compl., ¶ 308.) This court has recommended that Defendants be granted summary judgment on Plaintiff's claim related to his nieces and nephews. (Doc. No. 120 at 9-10.) Thus, the court need not address this argument.

However, Plaintiff offers no explanation why it would be irrational to rely on his own words and does not state in his Amended Complaint that he now disagrees with his prior statements.

Plaintiff next argues that the restrictions are illegal because Defendants do not assert that his communications have ever harmed national security. On the contrary, the SAMs specifically rely on Plaintiff's martyrdom video encouraging others to answer the call of jihad. (Mot., Ex. 3 at 2; Ex. 4 at 2.) Given Plaintiff's attempts to incite others in the past, he offers no explanation why it would be irrational to conclude that he presents a risk of doing so again in the future.

Plaintiff spends much of his argument trying to distinguish his case from other SAMs cases. But this is a futile task. Defendants do not argue that Plaintiff committed the same crimes as other SAMs inmates. As Plaintiff acknowledges, the SAMs are judged based on whether there is a rational connection between his restrictions and the justifications for him. (Resp. at 13–14.) However, Plaintiff is completely silent in responding to the justifications for the impositions of *his* SAMs.

Plaintiff points to the decision in *Mohammed v. Holder*, No. 07–cv–2697–MSK–BNB, 2011 WL 4501959 (D. Colo. Sept. 29, 2011), in which former Chief Judge Krieger allowed a SAMs challenge to move forward because BOP had expressed its view that the SAMs there should allow "expanded communications" for the particular inmate and there was no explanation for why that inmate's restrictions had increased over time. *Id.* at *4–5, 8. Such circumstances do not apply here. Plaintiff does not allege disagreement over his communications restrictions, nor does he allege that his SAMs have become more restricted. Further, Judge Krieger did not have the benefit of later Tenth Circuit cases, including *Al–Owhali* and *Gowadia*, which make clear the heightened level of deference to be accorded in these cases.

Finally, Plaintiff argues that the SAMs restrictions are illegal because he believes other criminals have committed worse crimes—in particular, Ted Kaczynski (Unabomber), Eric Rudolph (Atlanta Olympics bomber) and Matthew Hale (white supremacist)—and those individuals are not on SAMs. (Resp. at 18–19.) Plaintiff appears to misunderstand the *Turner* test, which is not a least restrictive means analysis. *Turner*, 482 U.S. at 89–90 (rejecting such analysis as insufficiently deferential). If it were otherwise, the courts would be inundated with claims challenging prison restrictions because every prisoner would claim that another prisoner is "just as bad" but is not subject to some challenged restriction. It is not up to the courts to judge which prisoners are more or less dangerous. *Block v. Rutherford*, 468 U.S. 576, 588 (1984) ("emphasiz[ing] that we are unwilling to substitute our judgment on these difficult and sensitive matters" relating to security); *Turner*, 482 U.S. at 89 (explaining the reasonableness test is necessary so that the prisons, and not the courts, make the difficult judgments). This is especially so here where only Plaintiff is associated with an international terrorist organization, and it is not for courts to determine the relative risks of international terrorists compared to other types of criminals. Such issues of national security require deference.

The *Turner* standard focuses not on whether the challenged restrictions are actually necessary, but whether Defendants might rationally believe the restrictions advance the stated national security interests. *See Johnson v. California*, 543 U.S. 499, 513 (2005); *Sperry v. Werholtz*, 413 F. App'x 31, 40 (10th Cir. 2011); *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999); *Bruscino v. Pugh*, No. 02–cv–02362–LTB–PAC, 2006 WL 980580, at *8 (D. Colo. Apr. 11, 2006). Plaintiff's burden was to allege facts that, taken as true, show that Defendants could

not rationally believe the restrictions advanced their national security interests. Plaintiff has not addressed the stated justifications for the restrictions in his response.

Accordingly, Defendants' Motion to Dismiss Claims 2, 3, and 4 should be granted.

### 2. Claim 5—Fifth Amendment

In claim 5, Plaintiff merely repeats his allegations regarding the SAMs and alleges that by prohibiting him "from communicating with all but a small group of narrowly defined family members," the defendants are violating his substantive due process rights. (Compl., ¶¶ 314–15.) The Supreme Court and the Tenth Circuit have repeatedly rejected such duplicative claims. Because the Supreme Court has "always been reluctant to expand the concept of substantive due process," it has repeatedly held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998) (internal quotations and citations omitted) (alteration in original); *see also Conn v. Gabbert*, 526 U.S. 286, 293 (1999); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality); *Graham v. Connor*, 490 U. S. 386, 395 (1989); *Gehl Grp. v. Koby*, 63 F.3d 1528, 1539 (10th Cir. 1995) (same).

In this case, Plaintiff's substantive due process claim concerning the communications limitations in his SAMs is entirely duplicative of his First Amendment claims (Claims 2–4). Plaintiff may not seek to gain additional protections through substantive due process. "[S]ubstantive due process does not provide additional protections where, as here, it would be duplicative of other constitutional claims in the lawsuit. Plaintiff's claim will rise and fall on his First Amendment theory, not substantive due process." *Walker v. Scherbarth*, No. 15–CV–

00823–MJW, 2015 WL 5697366, at *4 (D. Colo. Sept. 29, 2015), *aff'd*, 676 F. App'x 815 (10th Cir. 2017); *see also Al–Owhali*, 2010 WL 5651033, at *9, *adopted in relevant part*, 2011 WL 288523, at *3 (rejecting substantive due process challenge to SAMs as duplicative).

Plaintiff argues that he should be able to pursue this claim because Defendants argue that his First Amendment claims fail to state a claim. However, "substantive due process does not provide additional protections where, as here, it would be duplicative of other constitutional claims in the lawsuit. Plaintiff's claim will rise and fall on his First Amendment theory, not substantive due process." *Walker v. Scherbarth*, No. 15–CV–00823–MJW, 2015 WL 5697366, at *4 (D. Colo. Sept. 29, 2015), aff'd, 676 F. App'x 815 (10th Cir. 2017); see also Al–Owhali, 2010 WL 5651033, at *9, adopted in relevant part, 2011 WL 288523, at *3 (rejecting substantive due process challenge to SAMs as duplicative). Thus, if the First Amendment does not protect his speech, Plaintiff cannot rely on substantive due process for additional protections. Moreover, SAMs do not implicate a "constitutionally protected liberty interest." *Gowadia*, 596 F. App'x at 674; *Salim v. Lynch*, No. 1:13–cv–03175–RM–CBS (D. Colo. Nov. 30, 2016) (Doc. No. 95); *Yousef v. United States*, No. 1:12–cv–02585–RPM, 2014 WL 1908711, at *5 (D. Colo. May 13, 2014). As such, it is impossible to state a due process claim, procedural or substantive.

The court recognizes, as Plaintiff points out in his response, that substantive due process violations have been recognized where government conduct "lacks fundamental fairness to a degree that shocks the conscience." *Masters v. Gilmore*, 663 F. Supp. 2d 1027, 1046 (D. Colo. 2009) (citing *Reali v. Abbot*, 90 F. App'x 319, 324 (10th Cir.2004)). However, this Court and the Tenth Circuit have upheld challenges to communications restrictions in SAMs. *Gowadia*, 596 F. App'x at 673–74; *Al–Owhali*, 687 F.3d at 1240–43; *Nicholson*, 2017 WL 4337896, at *4–

7; *Salim*, No. 1:13–cv–03175–RM–CBS, Doc. No. 95; *Ayyad*, 2014 WL 4747451, at *29.  This court cannot say that similar restrictions in this case shock the conscience.

Plaintiff's Claim 5 should be dismissed.

### B.  *Claims 7, 11, 12, and 13—Hunger-Strike Claims from 2012 and 2015*

In claims 7 and 11–13, Plaintiff challenges various BOP actions related to hunger strikes that he undertook in 2012 and 2015.  Plaintiff seeks purely prospective relief, asking the Court to enjoin the BOP from force-feeding him or taking any other actions in response to any hypothetical future hunger strikes that he might undertake at some unspecified future date.  Because Plaintiff did not face any certainly impending injury at the time he filed his complaint, he lacks standing to seek prospective relief. But even if he had standing, federal courts have uniformly ruled that force-feeding hunger-striking inmates is justified based on the government's compelling interests to preserve the inmate's health and to maintain prison order and discipline.

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.' "  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  " 'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.' "  *Id.*  "To establish Article III standing, an injury must be "[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling."  *Id.* at 409.  The party invoking federal jurisdiction bears the burden of establishing standing.  *Id.* at 411–12.  In this case, the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Id.* at 408.

Where, as here, a plaintiff seeks prospective relief, he must demonstrate that he is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *see also Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991) (same). The Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact." *Amnesty Int'l*, 568 U.S. at 409 (emphasis in original; internal quotations omitted); *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992).

Allegations of potential "injury at some indefinite future time" are insufficient because the Court has "insisted that the injury proceed with a high degree of immediacy." *Defenders of Wildlife*, 504 U.S. at 564 n.2; *Sierra Club v. Robertson*, 28 F.3d 753, 758 (8th Cir. 1994) ("[T]he Court invariably has insisted that the injury proceed with a high degree of immediacy.'"). *Branton v. FCC*, 993 F.2d 906, 910 (D.C. Cir. 1993) (same). "[W]ithout any description of concrete plans, or indeed even any specification of when the someday will be," there can be no "finding of the 'actual or imminent' injury that our cases require." *Defenders of Wildlife*, 504 U.S. at 564; *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016). It is likewise not enough to "observe that the challenged conduct is repeatable in the future" or "that the purportedly illegal practice is commonly used." *Lebron v. Rumsfeld*, 670 F.3d 540, 561 (4th Cir. 2012) (citing *Golden v. Zwickler*, 394 U.S. 103, 109 (1969); *Lyons*, 461 U.S. at 106)).

In this case, Plaintiff alleges that he was force-fed after undertaking hunger strikes in August 2012, October 2012, and July 2015. (Compl., ¶¶ 218, 231, 233.) Based on these three incidents years ago, Plaintiff brings various claims concerning the BOP's actions during the

hunger strikes, requesting purely prospective relief, including a "permanent injunction prohibiting Defendant BOP from force-feeding" him under any circumstances. (*Id.* at Claims 6–7, 11–13[5], Prayer for Relief.) Plaintiff's years'-old allegations fail to meet his burden to demonstrate that he faced a certainly impending injury at the time he filed his initial complaint. Plaintiff's standing argument is based on speculation that he may undertake a hunger strike at some future unspecified time and that the BOP may force-feed him. However, Plaintiff merely points to past conduct and suggests it is repeatable in the future—exactly the type of claim that has been repeatedly rejected.

In his response, Plaintiff argues not that all force-feeding is illegal, but force-feeding without medical necessity is illegal. (Resp. at 24–25.) However, this court has recommended the defendants be granted summary judgment on Plaintiff's Claims 7, 11, and 13, to the extent the claims assert Plaintiff was force-fed in 2012 and 2015 without medical necessity. (Doc. No. 120 at 10–13.) Moreover, there is no dispute that BOP regulations do not permit force-feeding without a physician determining that "an inmate's life or health will be threatened if treatment is not initiated immediately." 28 C.F.R. § 549.65. Plaintiff's claim therefore depends on a speculative chain of future events, culminating in Plaintiff's speculation that a future BOP physician will deliberately violate BOP regulations and order him force-fed without medical necessity. Plaintiff's claims are too speculative and attenuated to establish standing. *Amnesty Int'l*, 568 U.S. at 414 (rejecting standing based on such "speculative chain of possibilities").

---

[5] This court has recommended Defendants be granted summary judgment on Plaintiff's Claim 6 in its entirety (Doc. No. 120 at 6-8) and on Plaintiff's Claims 7, 11, and 13 in part (*id.* at 10-13). As such, the court will not address Defendants' arguments in this motion regarding Claim 6 specifically.

Plaintiff's Claims 7, 11, 12, and 13 should be dismissed without prejudice.[6]

## C. Claim 14—"Overall Condition" Claim

In his final claim, Plaintiff alleges that all of his conditions of confinement—the "totality of circumstances"—combine to constitute cruel and unusual punishment.  (Compl., ¶¶ 384–95.)  Both the Supreme Court and the Tenth Circuit have rejected such a challenge.  "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."  *Wilson v. Seiter*, 501 U.S. 294, 305 (1991).  Under the Eighth Amendment, conditions may only be analyzed in combination "when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets."  *Id.* at 304.  Thus, to state a claim, "a plaintiff must allege an 'unquestioned and serious deprivation of basic human needs,' such as 'food, warmth, or exercise.'"  *Gowadia*, 596 F. App'x at 674 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and *Wilson*, 501 U.S. at 304).  Based on this precedent, the Tenth Circuit and this Court have repeatedly held that conditions at the ADX, as alleged by Plaintiff and other inmates, do not violate the Eighth Amendment.  *Gowadia*, 596 F. App'x at 674; *Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003); *Ajaj v. United States*, 293 F. App'x 575, 582–84 (10th Cir. 2008); *Davis v. Fed. Bureau of Prisons*, No. 15–CV–0884–WJM–MJW, 2016 WL 1156755, at *6 (D. Colo. Mar. 24, 2016); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1250–51 (D. Colo. 2011).

Plaintiff asserts that his conditions combine to deny social interaction.  (Compl., ¶ 392.)  However, the Tenth Circuit has never determined that a lack of social interaction could rise to an

---

[6] Accordingly, the court need not address Defendants' Rule 12(b)(6) arguments as to these claims.

Eighth Amendment violation. *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 755–56 (10th Cir. 2014). More importantly, the Tenth Circuit has held that even if such claim could exist, Plaintiff's allegations, which demonstrate that he has some social interaction, cannot meet the standard. *Id.* Indeed, in *Silverstein*, the Tenth Circuit held that housing an inmate at Range 13 for three years—which Plaintiff alleges is far more isolated and involves far less social contact than his conditions in H–Unit (Compl., ¶ 33)—does not violate the Eighth Amendment. 559 F. App'x at 755–56. Plaintiff attempts to combine his allegations regarding force-feeding him while on a hunger strike or allegedly denying him halal to assert an Eighth Amendment claim. However, this is exactly what the Supreme Court held to be impermissible.

Plaintiff argues that the defendants' reliance on *Silverstein* is misplaced because Silverstein was not under SAMs, and his claims were based on a lack of social contact and environmental stimulation for an extended time, *id.* at 758, whereas in this case, Plaintiff has alleged psychological harm not only from prolonged solitary confinement but also restrictive communication measures coupled with deprivations of the opportunity to remediate his harsh conditions of confinement with either religious practice or peaceful protest. (Compl., ¶ 393.) The plaintiff in *Silverstein* alleged he lacked the opportunity for any social visits or phone calls because of restrictive rules and could only correspond with a few individuals. 559 F. App'x at 743, 749. In contrast, Plaintiff alleges he is allowed to communicate via phone three times per month with his family (Compl., ¶ 141), he is allowed to have in-person social and legal visits with his family and counsel (*id.*, ¶ 140), and he is permitted to correspond with family and counsel (*id.*, ¶¶ 140, 142). Plaintiff alleges he is permitted two hours of recreation per day and can interact with other inmates during this time. (*Id.*, ¶¶ 118, 191.) There is no distinguishable

feature between Plaintiff's conditions and *Silverstein* or the numerous other cases in which the Tenth Circuit and this Court have held the conditions at ADX do not violate the Eighth Amendment.

Accordingly, Plaintiff's Claim 14 should be dismissed.

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that Defendants' "Motion to Dismiss Amended Complaint [76]" be **GRANTED in part**, that Claims 7, 11, 12, and 13 be dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(1), and that Claims 2, 3, 4, 5, and 14 be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6). The court further

**RECOMMENDS** that the motion be **DENIED in part as moot** as to Claims 1 and 6, which this court does not address in this Recommendation based on its previous Recommendation (Doc. No. 120) that Defendants be granted summary judgment on those claims for Plaintiff's failure to exhaust his administrative remedies.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop.*

*Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (stating that a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059–60 (stating that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (holding that cross-claimant had waived its right to appeal those portions of the ruling by failing to object to certain portions of the magistrate judge's order); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (holding that plaintiffs waived their right to appeal the magistrate judge's ruling by their failure to file objections). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (stating that firm waiver rule does not apply when the interests of justice require review).

Dated this 6th day of March, 2019.

BY THE COURT:

_____
Kathleen M. Tafoya
United States Magistrate Judge